**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **LUKAS CORRIGAN**<br>**50 Franklin Avenue**<br>**Derby, Connecticut 06418**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**BALTIMORE CITY, MARYLAND:**<br>**BALTIMORE POLICE DEPARTMENT**<br>**242 W. 29th Street**<br>**Baltimore, MD 21211**<br><br>***Defendant.***<br><br>**Serve:**<br><br>**The Baltimore City Law Department**<br>**Office of Legal Affairs**<br>**C/O City Hall, Room 101**<br>**100 N. Holliday St., Suite 101**<br>**Baltimore MD, 21202**<br><br>**Baltimore Police Headquarters**<br>**601 E. Fayette St.**<br>**Baltimore, MD 21202** | **Case No.: 1:24-cv-3497**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES**

Plaintiff Lukas Corrigan ("Plaintiff" or "Mr. Corrigan"), by and through his undersigned counsel, hereby files this Complaint against Defendant, the Baltimore City Police Department ("Defendant," "BPD," or "the Department"), and alleges as follows:

## INTRODUCTION

1. This is an action for disability discrimination under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 *et seq*., and the Maryland Fair Employment Practices

Act ("FEPA"), Md. Code Ann., State Gov't § 20-601 *et seq*., arising from the Defendant's unlawful actions in discriminating against Plaintiff based on a perceived disability, subjecting him to a hostile work environment, and leading to his constructive termination.

2. Specifically, Plaintiff was discriminated against and subjected to a hostile work environment due to a perceived disability during his employment with the Baltimore City Police Department, culminating in his forced resignation. Despite being qualified for the position of police officer, Plaintiff was removed from training, placed on light-duty status, mocked, harassed, and ultimately forced to resign due to unfounded and prejudicial assumptions about his medical condition.

3. As a result of Defendant's actions, Plaintiff suffered emotional distress, humiliation, mental anguish, and loss of career opportunities.

**JURISDICTION AND VENUE**

4. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 *et seq*., to redress and enjoin employment practices of the Defendant.

5. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

6. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

7. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, the Defendant transact substantial business in this District, and maintains employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

8. Plaintiff has exhausted all of his administrative remedies.

9. Plaintiff filed a Form 5 charge of discrimination with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission (EEOC) on December 22, 2023, alleging disability discrimination. The charge was transferred to the Baltimore Community Relations Commission for processing of the claim on April 5, 2024.

10. Upon the request through counsel, on August 28, 2024, Plaintiff request the issuance of the Plaintiff a Right-to-Sue Letter and was provide with such on August 29, 2024 related to EEOC charge number 531-2024-01291.

11. Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

12. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

13. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of his constitutional and statutory rights.

14. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to the Plaintiff.

## PARTIES

15. Plaintiff, Lukas Corrigan, is an individual who was employed by the Baltimore City Police Department as an entry-level police recruit.

16. Defendant, the Baltimore City Police Department ("Defendant," "BPD," or "the Department"), is a municipal police force, whose jurisdiction encompasses Baltimore City, Maryland, the State's largest city.

17. BPD is the 8th largest municipal police force in the United States, staffed by nearly 3,100 civilian and sworn personnel. The Department's jurisdiction covers Maryland's largest city, with a population of 565,239.

18. During the relevant period, Defendant employed Plaintiff, and Plaintiff was an employee within the meaning, and entitled to the protections of Title VII.

## FACTUAL ALLEGATIONS

19. Plaintiff, Lukas Corrigan, was hired by the Defendant, Baltimore City Police Department, on June 20, 2023, after successfully completing the Department's hiring process, including a medical evaluation by Dr. Keith Lee at the Mercy Hospital Public Safety Infirmary (PSI), which was part of the Department's standard procedure for hiring new officers.

20. Plaintiff was placed into the academy class 23-03, which commenced on July 17, 2023. Throughout the early stages of training, Plaintiff performed well and demonstrated strong academic and physical abilities. He had no injuries, academic failures, or other issues. He consistently received above-average scores as he progressed through the initial stages of the police academy.

21. On August 21, 2023, as part of the Department's defensive tactics training, Plaintiff was called to a meeting with Sargent Christopher Icenroad. During this meeting, Sgt. Icenroad

commended Plaintiff's progress but also expressed concerns about what he referred to as Plaintiff's "perceived disability." Sgt. Icenroad suggested that Plaintiff might pose a risk to himself and others during training and ordered that Plaintiff be referred for a further medical evaluation by Mercy Hospital Public Safety Infirmary (PSI).

22. The perceived disability is observed as a slight limp which does not impair Plaintiff's ability to walk, run, or perform any of the essential duties required of him as a police officer. Plaintiff's condition is purely physical in nature and has no impact on his overall mobility or capacity to engage in activities such as running, standing for extended periods, or performing tasks that are typically required of a police officer in training. Despite the limp, Plaintiff has consistently demonstrated the ability to perform all job-related duties and training exercises without issue, and it has never been a hindrance to his performance in the police academy or in any physical activities related to law enforcement training. In fact, Plaintiff surpassed the Departments' initial physical test.

23. Despite Sgt. Icenroad stating that Plaintiff posed a "risk," Plaintiff was allowed to continue training in a full-duty capacity until his appointment on August 24, 2023.

24. On August 24, 2023, Plaintiff was evaluated by Dr. Romarius Longmire. Dr. Longmire's exam consisted of the same examination components that were given by Dr. Lee, when he was initially hired and deemed fit to proceed through the academy. However, Dr. Longmire's questions during the examination mimicked the concerns Sgt. Icenroad had voiced concerning Plaintiff's perceived disability. The results of the evaluation were inconclusive, nonetheless, Dr. Longmire placed Plaintiff on light-duty training status, meaning Plaintiff was restricted from physical activities and prohibited from wearing tactical equipment.

25. Plaintiff was referred to a specialist at the NovaCare facility for further evaluation. On September 11, 2023, Plaintiff underwent similar test in his previous examinations with an added one-mile treadmill exercise and a weight drag exercise. Plaintiff completed the mile run with no issue as well as the weight drag exercise, however, the examiner deemed the weight drag exercise as unsuccessful. Plaintiff successfully completed the weight drag assessment at the beginning of the academy, which required pulling a 150-pound free-moving dummy 15 feet and did so without issue. However, during a subsequent test with the specialist, the procedure differed significantly and was flawed. Instead of using the free-moving dummy, the specialist used a stationary cable "pulley" machine from the gym, which was set to 150lbs. Although Plaintiff was able to pull the machine, it could not be moved 15 feet because the machine was designed for shorter distances, with a maximum extension of only 10 feet, not the 15 feet required by the standard. The machine's limitations, not Plaintiff's abilities, prevented the completion of the test, making the exercise inherently designed for failure.

26. The assessment continued with other exercises that Plaintiff found irrelevant and easy, such as stacking cones, picking up tennis balls, and carrying boxes for several hours. Additionally, the specialist used a makeshift "duty belt" for a squat exercise, which consisted of a rope and weights, rather than an actual police duty belt. This was an inadequate substitute for the real equipment. Despite these discrepancies, Plaintiff was able to perform the exercises with no difficulty. Finally, Plaintiff was asked to walk up and down stairs as part of the test. The specialist determined that Plaintiff was in good health and referred him back to Dr. Longmire for a final examination. However, Plaintiff was subsequently told by Dr. Longmire on September 18, 2023, that he would remain on light-

duty permanently, with no hope of ever returning to the police academy and becoming a certified police officer as he was hired to and deemed fit to accomplish previously.

27. After being placed on light-duty status, Plaintiff was removed from the academy and relegated to sitting at the front desk with no meaningful job responsibilities for 127 days. Throughout the remainder of his time with BPD, Plaintiff was mocked and humiliated by fellow officers both in leadership and academy student status. The demeaning behavior, including discriminatory remarks and slurs, was based on his perceived disability. These comments ranged from remarks such as, "You're still here?" and "You should just quit" to discriminatory slurs such as referring to Plaintiff as "DOT Corrigan" (Disabled Officer Trainee), "Crip Walk Corrigan," and "Mick" (an ethnic slur). Plaintiff was subjected to constant ridicule.

28. On January 23, 2024, Sgt. Shawn Parlett made a disturbing comment implying that Plaintiff would "swallow a pistol" if he remained at the front desk. This remark was not only unprofessional and inappropriate but further exacerbated Plaintiff's mental distress.




29. On April 10, 2024, Plaintiff became aware of a "meme" that had been created by one of the officers at the academy and circulated in a group chat among officers and supervisors. The meme mocked Plaintiff and his perceived disability. It followed a conversation in which a Sergeant at the academy, an Iraq combat veteran, had shared news with other officers that the VA had increased his disability status and compensation. This conversation led to a series of jokes in which Plaintiff and the

Sergeant were referred to as part of a "disability club," with the officers calling them "disabilibuddies" ( a combination of the words disability and buddies). Plaintiff endured frequent, derogatory comments and nicknames, including but not limited to: "Light Duty Luke;" "DOT Corrigan" (Disabled Officer Trainee, instead of POT Corrigan); "Crip Walk Corrigan" (mocking his limp); "The Statue of Limperty;" and "Limp Bizkit" (a reference to the 90s punk band).

30. On May 24, 2024, while walking past Officer Damond Durant's office, Plaintiff was taunted with the comment: "Is it leg day?" Plaintiff simply replied, "Nope," and continued on his way. Sgt. Adriel Nuñez, who was standing nearby, remarked, "Did he really just say that?" Despite recognizing the derogatory nature of the comment, as a supervisor, Sgt. Nuñez did nothing to address or correct Officer Durant's inappropriate behavior.

31. On May 28, 2024, Plaintiff received an email from the Quartermaster about the pickup of a new bulletproof vest that had been ordered for him. The vest was needed because Plaintiff's original vest did not fit properly. Since Plaintiff was no longer in the academy and would not be needing the vest, he approached Sgt. Shawn Parlett to discuss how to inform the Quartermaster. As Plaintiff entered Sgt. Parlett's office and began to speak, Sgt. Parlett raised his middle finger at Plaintiff, staring directly at him. Plaintiff waited for the gesture to end before speaking again. After explaining the situation, Sgt. Parlett's only response was to tell Plaintiff, "Have Sgt. Willis deal with that," without offering any further assistance.

32. On May 30, 2024, while again heading to the gym during his lunch hour, Plaintiff was dressed in workout clothes, including a cutoff "muscle shirt." As he was walking out of the office space, Officer Rhys Dacuycuy mocked him by saying, "You have a muscle shirt on,

but I'm just waiting for the muscles to arrive." Before Plaintiff could respond, Officer Dacuycuy mimicked the spastic muscle flexion of individuals with cerebral palsy, bending his wrist across his chest and speaking in a slow, droopy voice, as if to mock someone with special needs. When called out about the mocking gestures, Officer Dacuycuy stated, "It's not my fault [Corrigan has] multiple sclerosis." Although Plaintiff does not have multiple sclerosis, the mocking tone and gestures were meant to be derogatory and offensive.

33. On May 31, 2024, Plaintiff overheard a conversation between Officer Rhys Dacuycuy and Officer James Wynne just outside his cubicle. Although Plaintiff did not understand the context of the conversation, he was startled when Officer Dacuycuy loudly exclaimed, "I'll just go outside into the hallway and yell, I'm autistic and my name is Corrigan!" It was clear based on the comment and tone that the officers' intent was to mock and belittle Plaintiff based on his perceived disability.

34. The mocking names and the constant ridicule created a toxic and hostile work environment for Plaintiff. Despite his attempts to endure this mistreatment, the accumulation of these incidents took a serious toll on his mental health and well-being. Plaintiff refrained from reporting the incidents due to fear of retaliation and because he relied financially on the Department. He had been told from the outset of the academy that such jokes and remarks were part of the job, and that he needed to "toughen up" to prepare for the challenges of law enforcement. However, the escalation of such behavior, including the creation of mocking images, crossed a line that made the environment untenable.

35. Plaintiff's perceived disability led to a decline in his reputation in the Department, which further adversely affected his ability to continue progressing through the police academy and hindered his chances of securing other employment opportunities within BPD.

36. Despite repeated requests for reassignment or other work, Plaintiff was left isolated and demoralized. He was eventually encouraged by multiple officers to apply for civilian roles within the Department, but he was denied those positions as well.

37. In the face of relentless humiliation, harassment, and isolation, Plaintiff resigned from his position on July 1, 2024, unable to endure the toxic and hostile work environment.

**COUNT I**

**DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)**

38. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

39. Plaintiff is a qualified individual with a perceived disability within the meaning of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*.

40. The ADA prohibits discrimination based on disability, including discrimination based on perceived disability. *See* 42 U.S.C. § 12101 *et seq*. The ADA requires that covered employers provide reasonable accommodations to employees with disabilities, perceived or otherwise.

41. Defendant discriminated against Plaintiff on the basis of a perceived disability by taking adverse employment actions against him, including but not limited to:

    a. Subjecting Plaintiff to discriminatory treatment and ridicule based on his perceived disability (a slight limp) which did not hinder his ability to perform essential job functions;

    b. Denying Plaintiff a reasonable accommodation to perform his job duties in a full-duty capacity despite medical evidence indicating that Plaintiff was capable of doing so;

c. Placing Plaintiff on indefinite light-duty status despite medical evaluations indicating he was fit for full-duty status;

d. Denying Plaintiff reasonable reassignment to other work roles and assignments based on his perceived disability;

e. Isolating Plaintiff from meaningful work responsibilities, relegating him to front desk duties for an extended period, and ultimately encouraging him to apply for civilian positions which were denied due to his perceived disability;

f. Subjecting Plaintiff to derogatory and discriminatory comments, nicknames, and a hostile work environment based on his perceived disability.

42. Defendant failed to provide reasonable accommodations to Plaintiff, in violation of the ADA.

43. At all times, Plaintiff performed his job duties and met his training requirements satisfactorily, and there is no evidence to suggest that he was ever unable to perform his duties or meet his training requirements in a satisfactory manner.

44. Plaintiff was similarly situated to the other BPD academy trainees without a perceived disability, as they held the same position, performed the same job duties, underwent the same training, and were subject to the same policies and procedures, but did not face the same adverse treatment.

45. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies, to include Attorneys' fees.

## COUNT II

## HOSTILE WORK ENVIRONMENT BASED ON DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)

46. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

47. Defendant, through its employees, subjected Plaintiff to a hostile work environment based on his perceived disability. This hostile work environment was created by:

    a. The continuous ridicule, mockery, and demeaning comments regarding Plaintiff's perceived disability, including but not limited to the use of derogatory nicknames such as "DOT Corrigan," "Crip Walk Corrigan," "Light Duty Luke," "The Statue of Limperty," and "Limp Bizkit";

    b. The creation and circulation of a "meme" mocking Plaintiff's perceived disability, which was shared in a group chat among officers and supervisors;

    c. The failure of supervisors, including Sgt. Shawn Parlett and Sgt. Adriel Nuñez, to intervene or take corrective actions when Plaintiff was subjected to verbal and physical harassment;

    d. The unprofessional and inappropriate comments made by Plaintiff's colleagues, including Sgt. Shawn Parlett's insinuation that Plaintiff would "swallow a pistol" and Officer Rhys Dacuycuy's mocking gestures and remarks about Plaintiff's perceived condition.

48. The conduct described above was sufficiently severe or pervasive to create a toxic and hostile work environment that unreasonably interfered with Plaintiff's ability to perform his job and caused Plaintiff emotional distress and harm.

49. Despite Plaintiff's efforts to endure the mistreatment and his failure to report due to fear of retaliation, Defendant failed to take appropriate corrective action to end the harassment and address the hostile work environment.

50. As a direct result of the hostile work environment, Plaintiff suffered mental anguish, emotional distress, and a decline in his professional reputation and career prospects within the BPD.

51. Defendant's conduct constitutes a violation of the ADA, 42 U.S.C. § 12112, by creating and maintaining a hostile work environment based on Plaintiff's perceived disability.

52. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior. Defendant knew or should have known about the discrimination and harassment and failed to take prompt and appropriate corrective action to protect Plaintiff.

53. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies, to include Attorneys' fees.

## COUNT III

**DISABILITY DISCRIMINATION IN VIOLATION OF THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT (FEPA)**

54. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

55. The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. outlaws discrimination in employment based perceived disability by employers with more than 15 employees.

56. Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions. Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

57. Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

58. Defendant discriminated against Plaintiff based on his perceived disability by:

   a. Subjecting Plaintiff to unfavorable treatment, including being placed on light-duty status and excluded from meaningful work due to the perceived disability;

   b. Denying Plaintiff a reasonable accommodation to perform his job duties in a full-duty capacity despite medical evidence indicating that Plaintiff was capable of doing so;

   c. Placing Plaintiff on indefinite light-duty status despite medical evaluations indicating he was fit for full-duty status;

   d. Failing to address the harassment and derogatory remarks made by other officers regarding Plaintiff's perceived disability;

e. Encouraging Plaintiff to resign from his position and pursue civilian roles due to his perceived disability, which were ultimately denied.

59. Defendant's actions violate the Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't § 20-609, by discriminating against Plaintiff based on his perceived disability.

60. The Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his perceived disability.

61. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

62. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

63. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs –and is entitled to all available legal and equitable remedies.

64. At all times, Plaintiff performed his job duties and met his training requirements satisfactorily, and there is no evidence to suggest that he was ever unable to perform his duties or meet his training requirements in a satisfactory manner.

65. Plaintiff was similarly situated to the other BPD academy trainees without a perceived disability, as they held the same position, performed the same job duties, underwent the

same training, and were subject to the same policies and procedures, but did not face the same adverse treatment.

66. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies, to include Attorneys' fees.

**COUNT IV**

**HOSTILE WORK ENVIRONMENT UNDER THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA")**

67. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

68. The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

69. Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions. Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

70. Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

71. The Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his perceived disability.

72. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior. Defendant knew or should have known about the discrimination and harassment and failed to take prompt and appropriate corrective action to protect Plaintiff.

73. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies, to include Attorneys' fees.

**COUNT V**

**CONSTRUCTIVE TERMINATION UNDER THE AMERICANS WITH DISABILITIES ACT (ADA)**

74. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

75. Plaintiff's resignation constitutes constructive termination under the ADA, 42 U.S.C. § 12101 *et seq*. An employee is "constructively discharged" if he resigns after his "working conditions become so intolerable that a reasonable person in the employee's position would

have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555, 136 S. Ct. 1769, 195 L. Ed. 2d 44 (2016).

76. Plaintiff was subjected to a continuous and intolerable work environment, including discriminatory treatment, harassment, and a failure to provide reasonable accommodations due to his perceived disability. This conduct created an environment that was hostile, degrading, and mentally distressing. Each day, Plaintiff struggled to manage the distressing feelings that arose whenever he had to go to work. The constant ridicule, mocking, and exclusion created an environment where simply stepping into the workplace left Plaintiff with a heavy "pit" in his stomach, a physical manifestation of the anxiety he experienced while at the Department. Plaintiff developed severe insomnia, experiencing debilitating sleep disturbances starting from October 2023. For nearly nine months, Plaintiff was only able to sleep for 2-3 hours a night, often staying awake for days at a time due to overwhelming stress. This chronic lack of sleep led to dangerous lapses in mental clarity and caused serious concerns about Plaintiff's personal safety and mental health.

77. In addition to the insomnia, Plaintiff developed a caffeine addiction, consuming over 1000mg of caffeine daily—equivalent to more than ten cups of coffee—just to function. Plaintiff also developed an unhealthy obsession with fitness, working out excessively in an attempt to gain approval from the Department, further exacerbating the stress and creating a vicious cycle of self-abuse.

78. Plaintiff's emotional distress was so significant that he often found himself fighting back tears, struggling to maintain composure while enduring constant ridicule from his colleagues. The relentless taunting and bullying left him feeling humiliated and degraded. The severity of the emotional toll made every day at work feel like an insurmountable

challenge. The psychological burden was not just limited to the workplace itself but seeped into other aspects of his life, further exacerbating his mental health struggles.

79. Plaintiff's work environment, as described above, became so unbearable that a reasonable person in Plaintiff's position would have been compelled to resign. Despite his efforts to endure the mistreatment, Plaintiff's ability to perform and maintain at his job was significantly impacted, as he was subjected to constant ridicule, humiliation, and isolation.

80. Plaintiff's ability to perform his job and fully engage in the required duties was severely compromised by the harassment he faced. The mental and emotional exhaustion, coupled with the constant feelings of being targeted, left him unable to concentrate or focus on the tasks required to advance in his career. This made his work performance increasingly difficult and further alienated him from his colleagues, amplifying the toxic atmosphere he was subjected to on a daily basis.

81. Defendant's actions and omissions, including but not limited to subjecting Plaintiff to derogatory comments, mocking behavior, failure to address harassment, and refusing to provide reasonable accommodations or meaningful work assignments, rendered Plaintiff's continued employment untenable.

82. As a result of the hostile work environment, Plaintiff was forced to resign from his position on July 1, 2024. Plaintiff's resignation was not voluntary but was the direct result of Defendant's discriminatory conduct and the creation of a work environment so intolerable that resignation was the only reasonable option.

83. Defendant's aforementioned conduct was intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his perceived disability. Specifically, the Defendant intentionally created and perpetuated an

environment that was hostile and intolerable for the Plaintiff by allowing discriminatory and harassing behavior to persist without intervention. Despite being aware of the ongoing mistreatment, the Defendant failed to take appropriate action to prevent or remedy the situation, thereby allowing the harassment to continue unabated. This deliberate disregard for the Plaintiff's rights and well-being reflects an intentional effort to subject him to adverse conditions based on his perceived disability, resulting in his compelled resignation.

84. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior. Defendant knew or should have known about the discrimination and harassment and failed to take prompt and appropriate corrective action to protect Plaintiff.

85. Plaintiff is entitled to all damages resulting from his constructive termination, including but not limited to lost wages, emotional distress, and damages arising from the violation of his rights under the ADA.

**COUNT VI**

**CONSTRUCTIVE TERMINATION UNDER THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT (FEPA)**

86. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

87. Plaintiff's resignation constitutes constructive termination under the Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't § 20-601 *et seq*. "[A] constructive discharge occurs . . . when an employer deliberately causes or allows the employee's working conditions to become so intolerable that the employee is forced into

an involuntary resignation." *Jackson v. Clark*, 564 F.Supp.2d 483, 492 (D.Md. 2008) (internal quotation marks omitted).

88. Plaintiff was subjected to a continuous and intolerable work environment, including discriminatory treatment, harassment, and a failure to provide reasonable accommodations due to his perceived disability. This conduct created an environment that was hostile, degrading, and mentally distressing. Each day, Plaintiff struggled to manage the distressing feelings that arose whenever he had to go to work. The constant ridicule, mocking, and exclusion created an environment where simply stepping into the workplace left Plaintiff with a heavy "pit" in his stomach, a physical manifestation of the anxiety he experienced while at the Department. Plaintiff developed severe insomnia, experiencing debilitating sleep disturbances starting from October 2023. For nearly nine months, Plaintiff was only able to sleep for 2-3 hours a night, often staying awake for days at a time due to overwhelming stress. This chronic lack of sleep led to dangerous lapses in mental clarity and caused serious concerns about Plaintiff's personal safety and mental health.

89. In addition to the insomnia, Plaintiff developed a caffeine addiction, consuming over 1000mg of caffeine daily—equivalent to more than ten cups of coffee—just to function. Plaintiff also developed an unhealthy obsession with fitness, working out excessively in an attempt to gain approval from the Department, further exacerbating the stress and creating a vicious cycle of self-abuse.

90. Plaintiff's emotional distress was so significant that he often found himself fighting back tears, struggling to maintain composure while enduring constant ridicule from his colleagues. The relentless taunting and bullying left him feeling humiliated and degraded. The severity of the emotional toll made every day at work feel like an insurmountable

challenge. The psychological burden was not just limited to the workplace itself but seeped into other aspects of his life, further exacerbating his mental health struggles.

91. Plaintiff's work environment, as described above, became so unbearable that a reasonable person in Plaintiff's position would have been compelled to resign. Despite his efforts to endure the mistreatment, Plaintiff's ability to perform and maintain at his job was significantly impacted, as he was subjected to constant ridicule, humiliation, and isolation.

92. Plaintiff's ability to perform his job and fully engage in the required duties was severely compromised by the harassment he faced. The mental and emotional exhaustion, coupled with the constant feelings of being targeted, left him unable to concentrate or focus on the tasks required to advance in his career. This made his work performance increasingly difficult and further alienated him from his colleagues, amplifying the toxic atmosphere he was subjected to on a daily basis.

93. Defendant's actions and omissions, including but not limited to subjecting Plaintiff to derogatory comments, mocking behavior, failure to address harassment, and refusing to provide reasonable accommodations or meaningful work assignments, rendered Plaintiff's continued employment untenable.

94. As a result of the hostile work environment, Plaintiff was forced to resign from his position on July 1, 2024. Plaintiff's resignation was not voluntary but was the direct result of Defendant's discriminatory conduct and the creation of a work environment so intolerable that resignation was the only reasonable option.

95. Defendant's aforementioned conduct was intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his perceived disability. Specifically, the Defendant intentionally created and perpetuated an

environment that was hostile and intolerable for the Plaintiff by allowing discriminatory and harassing behavior to persist without intervention. Despite being aware of the ongoing mistreatment, the Defendant failed to take appropriate action to prevent or remedy the situation, thereby allowing the harassment to continue unabated. This deliberate disregard for the Plaintiff's rights and well-being reflects an intentional effort to subject him to adverse conditions based on his perceived disability, resulting in his compelled resignation.

96. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior. Defendant knew or should have known about the discrimination and harassment and failed to take prompt and appropriate corrective action to protect Plaintiff.

97. Plaintiff is entitled to all damages resulting from his constructive termination, including but not limited to lost wages, emotional distress, and damages arising from the violation of his rights under the FEPA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Lukas Corrigan, respectfully prays that this Court grant the following relief:

a. Enter a declaratory judgement finding that the foregoing actions of Defendant violated the ADA and FEPA;

b. Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c. Award compensatory damages, in an amount to be determined at a hearing on the merits, to fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendant alleged herein;

d. Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e. Order such other relief as this Court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: December 3, 2024

Respectfully submitted,

By: /s/ Dionna Maria Lewis
Dionna Maria Lewis, Esq.
Bar No. 19486
District Legal Group, PLLC
700 Pennsylvania Ave SE, Suite2098
Washington, D.C.20003
Tel. (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Lukas Corrigan*