## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LUKAS CORRIGAN,

    *Plaintiff,*

    v.

BALTIMORE POLICE DEPARTMENT,

    *Defendant.*

Civil Action No. ELH-24-03497

### MEMORANDUM OPINION

In this employment discrimination case, plaintiff Lukas Corrigan asserts a host of claims against his former employer, the Baltimore Police Department (the "BPD" or the "Department"), defendant. ECF 1 (Complaint). The claims are predicated on Title I of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101, *et seq.*, and the Maryland Fair Employment Practices Act (the "MFEPA"), Maryland Code (2020 Repl. Vol., 2022 Supp.), § 20-601 of the State Government Article ("S.G.").

In particular, Count I alleges disability discrimination, in violation of the ADA (ECF 1, ¶¶ 38–45); Count II asserts hostile work environment, in violation of the ADA (*id.* ¶¶ 46–53); Count III alleges disability discrimination, in violation of MFEPA (*id.* ¶¶ 54–66); Count IV asserts hostile work environment, in violation of MFEPA (*id.* ¶¶ 67–73); Count V alleges constructive termination, in violation of the ADA (*id.* ¶¶ 74–85); and Count VI asserts constructive termination, in violation of MFEPA (*id.* ¶¶ 86–97). Corrigan seeks declaratory and injunctive relief as well as "compensatory damages and attorneys' fees. *Id.* at 23–24.

Defendant has moved to dismiss the Complaint (ECF 9), pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1). The motion is supported by a memorandum (ECF 9-1) (collectively, the "Motion"). The BPD argues that Corrigan's claims are barred as untimely. ECF 9-1 at 4. It also

claims that Corrigan's state law claims are subject to dismissal because he failed to comply with the Local Government Tort Claims Act ("LGTCA"), Md. Code (2020 Repl. Vol., 2025 Supp.), § 5-304 of the Courts and Judicial Proceedings Article ("C.J."). *See id.* at 4, 6 n.3. Additionally, BPD claims that it is immune from Corrigan's state law claims because it is a State agency and therefore entitled to State sovereign immunity. *Id.* at 6–8.

Plaintiff opposes the Motion. ECF 14. He filed two memoranda in support of his opposition (ECF 15; ECF 16) (collectively, the "Opposition"). The Opposition is also supported by exhibits. *See* ECF 15-1; ECF 15-2; ECF 16-1 to ECF 16-5. Defendant replied. ECF 17 (the "Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I.    Procedural and Factual Background[1]

The BPD hired Corrigan on June 20, 2023. ECF 1, ¶ 19. By that point, Corrigan had completed the BPD's hiring process, which included a medical evaluation at the Mercy Hospital Public Safety Infirmary ("PSI"). *Id.* ¶ 19. Corrigan began his training at the police academy in July 2023. *Id.* ¶ 20. During "the early stages of training," Corrigan "performed well and demonstrated strong academic and physical abilities" and "consistently received above average scores[.]" *Id.*

On August 21, 2023, Corrigan met with Sergeant Christopher Icenroad, in connection with his defensive tactics training. *Id.* ¶ 21. Sergeant Icenroad "expressed concerns about what he referred to as Plaintiff's 'perceived disability.'" *Id.* Sergeant Icenroad "suggested that Plaintiff

---

[1] As discussed, *infra,* at this juncture I must assume the truth of the facts alleged in the suit. *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019). Therefore, the factual summary is derived largely from the Complaint and certain exhibits.

might pose a risk to himself and others during training and ordered that Plaintiff be referred for a further medical evaluation" at PSI.  *Id.*

According to plaintiff, the "perceived disability" referenced by Icenroad is a "slight limp" that "does not impair" his "ability to walk, run, or perform any of the essential duties required of him as a police officer."  *Id.* ¶ 22.  Moreover, plaintiff asserts that his limp "has no impact on his overall mobility or capacity to engage in activities such as running, standing for extended periods, or performing tasks that are typically required of a police officer in training."  *Id.*  Corrigan adds that the limp "has never been a hindrance to his performance in the police academy or in any physical activities related to law enforcement training."  *Id.*

Corrigan continued training at full-duty capacity.  *Id.* ¶ 23.  On August 24, 2023, he had another medical evaluation at PSI (*id.* ¶¶ 23, 24), based on the same criteria used for his initial medical evaluation.  *Id.* ¶ 24.  Dr. Romarius Longmire, who conducted the second evaluation, allegedly posed "questions" to plaintiff that "mimicked the concerns Sgt. Icenroad had voiced concerning Plaintiff's perceived disability."  *Id.*

The evaluation yielded "inconclusive" results.  *Id.*  Nevertheless, Dr. Longmire "placed Plaintiff on light-duty training status, meaning Plaintiff was restricted from physical activities and prohibited from wearing tactical equipment."  *Id.*

Corrigan was referred to a specialist at NovaCare for further evaluation.  *Id.* ¶ 25.  The third evaluation took place on September 11, 2023.  *Id.*  It was similar to the prior evaluations, with two additional components: Corrigan had to do a "one-mile treadmill exercise" and a "weight drag exercise."  *Id.*  Although Corrigan claims that he "completed" both exercises with "no issue", "the examiner deemed the weight drag as unsuccessful."  *Id.*

According to Corrigan, the weight drag exercise at the third evaluation "differed significantly" from the one at the initial evaluation. *Id.* At the initial evaluation, the weight drag exercise required "pulling a 150-pound free-moving dummy 15 feet[.]" *Id.* But, on this occasion, a "stationary cable 'pulley' machine" was used, "which was set to 150lbs." *Id.* Corrigan claims that although he could "pull the machine, it could not be moved 15 feet because the machine [had] a maximum extension of only 10 feet[.]" *Id.* Therefore, according to Corrigan, it was "[t]he machine's limitations, not Plaintiff's abilities," that "prevented the completion of the test[.]" *Id.* In his view, the testing exercise was "designed for failure." *Id.*

The remainder of the evaluation lasted "several hours" and involved a variety of physical exercises that Corrigan found "irrelevant and easy[.]" *Id.* ¶ 26. Corrigan "was able to perform the exercises with no difficulty." *Id.* Moreover, "[t]he specialist determined that Plaintiff was in good health and referred him back to Dr. Longmire for a final examination." *Id.*

A week after plaintiff's third physical, Dr. Longmire told Corrigan that "he would remain on light-duty permanently, with no hope of ever returning to the police academy and becoming a certified police officer[.]" *Id.* After being placed on light-duty status, Corrigan was "removed from the academy and relegated to sitting at the front desk with no meaningful job responsibilities for 127 days." *Id.* ¶ 27. This shift to light-duty status triggered harassment and humiliation from Corrigan's "fellow officers both in leadership and academy student status", and Corrigan asserts that it continued "[t]hroughout the remainder of his time with BPD[.]" *Id.*

According to Corrigan, he was subject to "discriminatory remarks and slurs . . . based on his perceived disability" and he was the target of "constant ridicule." *Id.* For example, Corrigan claims that he was told he should "'just quit'" and was asked why he was "'still here[.]'" *Id.* Additionally, fellow officers referred to plaintiff as "'Crip walk Corrigan'"; "'Mick' (an ethnic

4

slur)"; "'DOT Corrigan' (Disabled Officer Trainee)"; "'Light Duty Luke'"; "'The Statue of Limperty'"; and "'Limp Bizket' (a reference to the 90s punk band)".  *Id.* ¶¶ 27, 29.

Corrigan references several specific instances of discriminatory treatment.  For example, on April 10, 2024, Corrigan learned that one of the officers at the academy created a meme that "mocked" Corrigan's disability.  *Id.* ¶ 29.  It was circulated in a "group chat among officers and supervisors."  *Id.*  The meme is reproduced below, from what appears to be a picture of the meme on someone's cell phone.  *Id.* ¶¶ 28, 29.



Plaintiff alleges that this meme "followed a conversation in which a Sergeant at the academy, an Iraq combat veteran, had shared news with other officers that the VA, *i.e.*, [U.S. Department of Veteran Affairs] had increased his disability status and compensation."  *Id.* ¶ 29.  Corrigan claims that this discussion regarding another officer's disability status triggered jokes at Corrigan's expense, with the officers grouping Corrigan with this Sergeant, calling them "'disabilibuddies'" and members of a "'disability club[.]'"  *Id.*

On May 24, 2024, as Corrigan walked past a fellow officer, Damond Durant, Officer Durant "taunted" Corrigan by asking him if it was "'leg day[.]'"  *Id.* ¶ 30.  Corrigan claims he simply responded, "'Nope.'"  *Id.*  Sergeant Adriel Nuñez, a supervisor, heard Officer Durant's comment yet "did nothing to address or correct" Officer Durant's "inappropriate behavior."  *Id.*

Then, on May 28, 2024, Corrigan "received an email from the Quartermaster" regarding "the pickup of a new bulletproof vest that had been ordered for him." *Id.* ¶ 31. Because Corrigan "was no longer in the academy" and did not need a vest, "he approached Sgt. Shawn Parlett to discuss how to inform the Quartermaster." *Id.* According to Corrigan, Sergeant Parlett "raised his middle finger at Plaintiff, staring directly at him." *Id.*

Corrigan alleges that he was mocked again on May 30, 2024. *Id.* ¶ 32. He recalls that he left the BPD in a "'muscle shirt'" to go to the gym during his lunch hour. *Id.* Officer Rhys Dacuycuy commented: "'You have a muscle shirt on, but I'm just waiting for the muscles to arrive.'" *Id.* Then, Officer Dacuycuy "mimicked the spastic muscle flexion of individuals with cerebral palsy, bending his wrist across his chest and speaking in a slow, droopy voice, as if to mock someone with special needs." *Id.* According to Corrigan, when Officer Dacuycuy's behavior was "called out," he responded: "It's not my fault [Corrigan has] multiple sclerosis", a condition that Corrigan does not have. *Id.* (alteration in original).

A day later, Corrigan overheard Officer Dacuycuy speaking with Officer James Wynne "just outside his cubicle." *Id.* ¶ 33. Officer Dacuycuy "loudly exclaimed, 'I'll just go outside into the hallway and yell, I'm autistic and my name is Corrigan!'" *Id.* Corrigan claims that, from the tone and content, Officer Dacuycuy's "intent was to mock and belittle Plaintiff based on his perceived disability."

According to Corrigan, the "ridicule . . . took a serious toll on his mental health and well-being." *Id.* ¶ 34; *see id.* ¶ 80. However, Corrigan "refrained from reporting the incidents due to fear of retaliation and because he relied financially on the Department." *Id.* ¶ 34. Corrigan alleges that he "developed severe insomnia, experiencing debilitating sleep disturbances starting from October 2023." *Id.* ¶¶ 76, 88. According to Corrigan, his "chronic lack of sleep led to dangerous

lapses in mental clarity and caused serious concerns about" his "personal safety and mental health." *Id.* ¶ 76. Corrigan also asserts that he "developed an unhealthy obsession with fitness, working out excessively in an attempt to gain approval from the Department[.]" *Id.* ¶ 77.

In addition, Corrigan claims that his "perceived disability" had a negative effect on his "reputation in the Department," which "adversely" impacted "his ability to continue progressing through the police academy and hindered his chances of securing other employment opportunities within the BPD." *Id.* ¶ 35. According to Corrigan, he made "repeated requests for reassignment or other work" and even applied "for civilian roles within the Department, but . . . was denied those positions as well." *Id.* ¶ 36.

Corrigan alleges that he was "unable to endure the toxic and hostile work environment" that he encountered at the BPD. *Id.* ¶ 37. Therefore, on July 1, 2024, Corrigan resigned. *Id.*

Plaintiff asserts that he has exhausted his administrative remedies. *Id.* ¶ 8. He recounts that he filed "a Form 5 charge of discrimination with the Baltimore Field Office of the" U.S. Equal Employment Opportunity Commission ("EEOC") "on December 22, 2023, alleging disability discrimination." *Id.* ¶ 9. But, Corrigan did not include a copy with his submissions. The charge "was transferred to the Baltimore Community Relations Commission for processing of the claim on April 5, 2024." *Id.*

In the Complaint, Corrigan alleges that he received a "Plaintiff a [sic] Right-to-Sue Letter" on August 29, 2024. ECF 1, ¶ 10. But, in his Opposition, Corrigan characterizes this statement as an "error." ECF 15 at 2. He asserts that the correct date is September 4, 2024. ECF 15 at 1; *see also* ECF 15-1 at 1. Corrigan appended to his Opposition what appear to be copies of a "Notice of Right to Sue Within 90 Days." ECF 15-1; ECF 16-2 (the "Right to Sue Notice" or "Notice"). It was issued by the EEOC, dated September 4, 2024.

Additionally, Corrigan appended to his memoranda copies of a document titled "Notice of Claims." ECF 15-2; ECF 16-3 (the "LGTCA Notice"). The LGTCA Notice, dated April 3, 2025, is addressed to the Maryland State Treasurer, Dereck E. Davis, and the Baltimore City Solicitor, Ebony Thompson. ECF 15-2 at 1.

Corrigan contends that he filed suit on December 3, 2024. ECF 1; ECF 14 at 1. However, the BPD asserts that suit was not filed until December 4, 2024. ECF 14 at 1. Notably, the Docket text associated with the Complaint (ECF 1) and the attachments states: "*Attachments* ***FILED IN ERROR - Not Flattened.*" (italics added).[2] The Docket also states, ECF 3: "The attached Civil Cover Sheet and Summons were not flattened. They have been marked as filed in error and corrected versions have been filed by the Clerk. No further corrective action is needed."

Corrigan also submitted with his Opposition a redline version of a proposed amended Complaint. ECF 16-4. However, Corrigan did not submit a separate motion to amend. Rather, his request for leave to amend is included in his Opposition. *See, e.g.,* ECF 16-1 at 7. Nor did he submit a clean version of the proposed amended complaint.

On September 4, 2024, plaintiff received, via email, the Right to Sue Notice relating to his EEOC charge. ECF 15-1 at 1.[3] The Right to Sue Notice informed Corrigan of his "right to institute

---

[2] PDF flattening is the process of combining the contents of a PDF into one layer that cannot be edited after the PDF is exported. *See How to Flatten a PDF: A Step-By-Step Guide,* ADOBE ACROBAT, https://perma.cc/SC2K-XJ4P (last accessed Oct. 20, 2025).

[3] In his Complaint, Corrigan alleges that he received the Right to Sue Notice on August 29, 2024. ECF 1 ¶ 10. Corrigan has claimed in his Opposition that the date of August 29, 2024, is an "error"[.] ECF 15 at 2. Corrigan appended the Right to Sue to his Opposition. ECF 15-1. According to that document, the EEOC sent the Right to Sue Notice via email to Corrigan's counsel, Dionna M. Lewis, on September 4, 2024. ECF 15-1 at 1. The email is addressed to: "Lukas Corrigan c/o Dionna M. Lewis, Esq."

a civil action against" the BPD pursuant to the ADA, provided that he files suit "in the appropriate court within 90 days of receipt of this Notice." *Id.*

Four months after filing his Complaint, on April 3, 2025, Corrigan sent the LGTCA Notice, via email and U.S. Certified Mail. ECF 15-2 at 1. As noted, the LGTCA Notice is addressed to the Maryland State Treasurer and the Baltimore City Solicitor, but the salutation is to the BPD. *Id.* The LGTCA Notice advises the City Solicitor and the State Treasurer of Corrigan's intent to file suit for disability discrimination pursuant to MFEPA and the ADA. *Id.* at 7

## II.    Contentions

### A.  BPD's Motion

The BPD seeks dismissal of Corrigan's claims for multiple reasons. The BPD seeks dismissal of the entire suit under Fed. R. Civ. P. 12(b)(6), claiming it is "time barred." ECF 9 at 1. According to the BPD, plaintiff "failed to timely file" his "claim with the Court after the issuance of" the Right to Sue Notice. ECF 9-1 at 4.

The BPD claims that Corrigan received the Right to Sue Notice on August 29, 2024. *Id.* at 2 (citing ECF 1, ¶ 10). The BPD notes that the Right to Sue Notice creates a 90 day statutory period to bring a civil action against the respondent named in the charge. *Id.* According to BPD, "[f]ailure to file a claim within the statutory period procedurally bars the litigant from pursuing that claim in court." *Id.* And, by BPD's calculation, Corrigan's "deadline to file his suit expired on November 27, 2024." ECF 9-1 at 5.

Corrigan appended the Right to Sue Notice (*see* ECF 15-1), dated September 4, 2024, to his Opposition. But, the BPD contends that the Court should not consider the actual date on the Right to Sue Notice because Corrigan is attempting "to amend his allegations through his Opposition papers via assertions, exhibits, and the attachment of a redlined amended complaint."

*Id.* Specifically, the BPD argues that because Corrigan has not followed the procedure to amend his Complaint, pursuant to Fed. R. Civ. P. 15, the Court cannot consider the Notice to Right to Sue. *Id.* Additionally, the BPD characterizes any claim by Corrigan that the BPD "somehow has personal knowledge of when" plaintiff "first received his 90-day letter [Right to Sue Notice]" as "disingenuous and without merit." *Id.* at 2 n.1.

Additionally, even if the Court considers the date of September 4, 2024, as the date when Corrigan received the Right to Sue Notice, the BPD argues that Corrigan's claims are still untimely. Dating from September 4, 2024, the deadline to file suit was December 3, 2024. But, the BPD claims that Corrigan's Complaint "was not properly filed (for whatever reason) with all proper papers until December 4, 2024, one day late." *Id.* at 3. Therefore, the BPD argues that Corrigan's suit is untimely, without regard to whether he received the Right to Sue Notice on August 29, 2024, or September 4, 2024. *Id.* at 2–3.

As to Corrigan's claims under Maryland law (disability discrimination, Count III; hostile work environment, Count IV; and constructive termination, Count VI), the BPD urges dismissal on the ground that it "is immune from suit." ECF 9-1 at 6. In addition, the BPD claims that Corrigan cannot bring suit because he failed to comply with the LGTCA. *Id.* at 6 n.3.

With regard to immunity, the BPD claims that it is a State agency and therefore "enjoys the common law sovereign immunity from tort liability . . . unless the immunity has been waived." ECF 9-1 at 6–7.[4] The BPD argues that "the Maryland General Assembly did not specifically waive BPD's total immunity from MFEPA claims." *Id.* at 7. But, it claims that the MFEPA statute "restricts the proper venue" for employment discrimination cases to "'the circuit court for the

---

[4] As discussed, *infra*, BPD's argument does not address recent legislative enactments that have extinguished BPD's status as a State agency under Maryland law.

county where the alleged unlawful employment practice occurred.'"  *Id.* (quoting S.G. § 20-1013(b)).    Therefore, the BPD claims that the State has not waived immunity for suit in federal court and so Corrigan's State law claims "must be dismissed."  *Id.* at 8.

Additionally, BPD claims that Corrigan's MFEPA claims should be dismissed because he did not comply with the LGTCA.  *Id.* at 6 n.3.  According to BPD, the LGTCA mandates that a plaintiff must satisfy the statute's notice requirements and include a description of that compliance in the plaintiff's Complaint.  *Id.*  According to BPD, because Corrigan "fail[ed] to allege compliance with the" LGTCA, his State claims must be dismissed.  *Id.*

Further, BPD claims that Corrigan failed to comply with the LGTCA because his notice did "not precede his lawsuit . . . ."  ECF 17 at 4.  In its view, BPD has "been prejudiced by" Corrigan's post-suit LGTCA Notice because the BPD did not have an "opportunity to conduct an investigation into the allegations."  *Id.*  Additionally, BPD argues that Corrigan's LGTCA Notice is untimely because "the facts giving rise to" his "claim accrued as early as January 23, 2024" (*id.* at 4), yet Corrigan sent the LGTCA Notice on April 3, 2025.  ECF 15-2 at 1.  Therefore, the BPD argues that the "one-year time limit for providing notice to the municipal officials has the same effect as a statute of limitations, and lack of timely notice bars the claim."  ECF 17 at 4.

### B.  Corrigan's Response

Corrigan argues that his claims are not time-barred, that he complied with the LGTCA, and that the BPD is not protected by sovereign immunity.  ECF 15 at 2–3.

As to BPD's contention that Corrigan's claims are barred because he failed to timely file suit after receiving the Right to Sue Notice, Corrigan contends that he received the Right to Sue Notice on September 4, 2024, and he appends a copy of it to his Opposition.  ECF 15-1.  Corrigan

refers to the statement in his Complaint that he received the Right to Sue Notice on August 29, 2024, as "incorrect" and a "typographical error[.]"  ECF 16-1 at 4.

Additionally, Corrigan asserts that he filed the Complaint on December 3, 2024.  *Id.* at 2. Therefore, Corrigan claims that he filed his suit within the required 90 day time limitation.  *Id.*

As to BPD's claim that Corrigan failed to comply with the LGTCA, Corrigan asserts that he sent the required Notice on April 3, 2025.  *Id.* at 6.  Corrigan also appended a copy of the LGTCA Notice to his Opposition.  ECF 15-2.  Corrigan identifies the date of injury as July 1, 2024, when he resigned from BPD, ECF 16-1 at 5, and asserts that he timely filed the LGTCA Notice "within one-year after the injury."  *Id.*  Alternatively, Corrigan claims that he timely sent the LGTCA Notice because "[t]he allegations in this complaint go all the way through as late as May 31, 2024."  ECF 15 at 3.

Corrigan seeks "leave to amend the complaint to correct the date of the Right to Sue letter" and to "include the Notice requirement being met with the April 3, 2025 Certified Letter[.]"  ECF 15 at 2, 4.  Corrigan also appended to his Opposition a redlined copy of a proposed amended Complaint.  ECF 16-4.  It corrects the date of receipt for the Right to Sue Notice and pleads compliance with the LGTCA.  *Id.* at 3.

With respect to BPD's claim of sovereign immunity, Corrigan asserts: "There is nothing in the Maryland Code related to claims of employment discrimination filed by a police officer, who is a public employee, against his employer, the Baltimore Police Department, which is a public employer."  ECF 15 at 3.  Corrigan also argues that Maryland has waived sovereign immunity for the BPD in MFEPA, noting that the statute "cites applicability to the" BPD.  ECF 16-1 at 7. Furthermore, Corrigan points to S.G. § 20-903, which provides: "The State, its officers, and its

units may not raise sovereign immunity as a defense against an award in an employment discrimination case under this title."

### III.    Legal Standards

### A.  Fed. R. Civ. P. 12(b)(6)

The BPD seeks dismissal of all claims, pursuant to Rule 12(b)(6).  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).

The "court's role under Rule 12(b)(6) is to evaluate the sufficiency of a complaint . . . ."  *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024).  Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *see Brown-Hyatt v. Brenner*, SAG-25-1737, 2025 WL 2855769, at *2 (D. Md. Oct. 8, 2025) (same).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'"); *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025); *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025); *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021); *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). A plausible claim is more than merely conceivable or speculative. *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In considering a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Hebb v. City of Asheville, N. Carolina,* 145 F.4th 421, 432 (4th Cir. 2025); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d

14

140, 146 (4th Cir. 2010).  Nor does the court accept "'legal conclusions couched as facts . . . .'" *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (citation omitted).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).  But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion.  *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022); *see Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021).

A plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).  However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of

15

action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

Ordinarily, when ruling on a Rule 12(b)(6) motion, a court does not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023); *Bing v. Brio Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (citation omitted) (a court may properly consider documents that are "explicitly incorporated into the complaint by reference . . . and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v.*

16

*Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Under limited circumstances, however, a court may consider documents beyond the complaint, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Carrington Sturgis v. Warden Jeff Nines*, SAG-25-841, 2025 WL 3240039, at *2 (D. Md. Nov. 20, 2025); *Finn v. Humane Soc'y of the United States*, 160 F.4th 92, 96 n.2 (4th Cir. 2025); *Kristen Moody v. The Board of Education Of Wicomico County, Defendant.*, SAG-25-00642, 2025 WL 3119201, at *4 (D. Md. Nov. 7, 2025); *Doriety*, 2024 WL 3558754, at *6; *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied sub nom.*, *City of Greensboro v. BNT Ad Agency, LLC*, 583 U.S. 1044 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam).

Notably, "[i]n employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Campbell v. Mayorkas*, MOC-20-697, 2021 WL 2210895, at *1 n.3 (W.D.N.C. June 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)); *see Jacques v. Balt. City Police Dep't*, SAG-21-02682, 2022 WL 1061980, at *3 (D. Md. Apr. 8, 2022); *Stennis v. Bowie State Univ.*, 236 F. Supp. 3d 903, 907 n.1 (D. Md. 2017), *aff'd in part*, *vacated in part on other grounds*, 716 F. App'x 164 (4th Cir. 2017). Moreover, in the usual course, the "exhibit-prevails rule" applies; it "provides that 'in the event of [a] conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails.'" *Goines*, 822 F.3d at 166 (citing *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Here, Corrigan appended to his Opposition a copy of the Right to Sue Notice (ECF 15-1) and a copy of the LGTCA Notice (ECF 15-2). There is no dispute as to their authenticity. In resolving the Motion, I may consider the EEOC Right to Sue Letter, as this document is integral to the suit. *See, e.g.*, *Webb v. Potomac Elec. Power Co.,* TDC-18-3303, 2020 WL 1083402, at *2

(D. Md. Mar. 6, 2020) ("[T]he Court will consider Webb's EEOC Charge, submitted with the Motion, as a document integral to the Amended Complaint because Webb referenced the EEOC Charge in the Amended Complaint and he has not objected to its authenticity."); *Evans v. Md. State Hwy. Admin.*, JKB-18-935, 2018 WL 4733159, at *1 n.1 (D. Md. Oct. 2, 2018) (same); *White v. Mortg. Dynamics, Inc.*, 528 F. Supp. 2d 576, 579 (D. Md. 2007) (same).

Based on the principles outlined above, I will also consider the LGTCA Notice (ECF 15-2). As with the Right to Sue Notice, the LGTCA Notice gives rise to "the legal rights asserted'" by plaintiff. *Chesapeake Bay Found., Inc.*, 794 F. Supp. at 611. Failure to comply with the LGTCA bars a plaintiff from bringing a tort claim against a local government. *See Renn v. Bd. of Comm'rs of Charles Cty*, 352 F. Supp. 2d 599, 602 (D. Md. 2005) ("Maryland courts have consistently held that the LGTCA's notice requirement is a condition precedent to the right to maintain an action for damages"). Additionally, other judges in the District of Maryland have considered an LGTCA notice as integral to the complaint. *See, e.g., Mealey v. Baltimore City Police Dep't,* JRR-21-02332, 2023 WL 2023262, at *18 n.11 (D. Md. Feb. 15, 2023) ("The LGTCA notice is integral to the Amended Complaint, because Plaintiff's entitlement to pursue Count II arises, in part, from his compliance with the LGTCA. Further, Plaintiff relies upon the notice in his Amended Complaint, and Defendants do not challenge its authenticity. Therefore, the court considers it.").

Even so, it is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g.*, *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713

19

F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

"[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc.*, 551 U.S. at 322; *Katyle*, 637 F.3d at 466; *Philips*, 572 F.3d at 180.  However, under Fed. R. Evid. 201, a court may only take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

A court "may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, PJM 14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir. 2016).  And, the Fourth Circuit has stated that a district court may take "judicial notice of its own records." *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990); *see also Thurman v. Robinson*, 51 F.3d 268, 1995 WL 133350, at *2 (4th Cir. Mar. 28, 1995) (per curiam); *United States Fidelity & Guar. Co. v. Lawrenson,* 334 F.2d 464, 467 (4th Cir. 1964).  Additionally, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the

document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### B.  Fed. R. Civ. P. 12(b)(1)

The BPD also seeks dismissal under Rule 12(b)(1), claiming lack of subject matter jurisdiction.  ECF 9-1 at 1.  "[B]efore a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court."  *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  In *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014), the Fourth Circuit observed: "Fundamental to our federal system is the principle that '[f]ederal courts are courts of limited jurisdiction.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994)) (alteration in Hanna).

"A motion to dismiss for lack of subject-matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), is a challenge to the Court's 'competence or authority to hear the case.'"  *Morales v. United States Postal Serv.*, LKG-24-02906, 2025 WL 3170845 (D. Md. Nov. 13, 2025) (quoting *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005)).  The determination of jurisdiction is a "threshold matter[.]"  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E. W. Const., Inc.,* 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs Of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999); *see Morales*, 2025 WL 3170845, at *2; *Farley v. United States Sec'y of Hous. Urb. Dev.*, PX-24-2718, 2025 WL 3151944, at *1 (D. Md. Nov. 12, 2025).  A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted);

*accord Hutton v. Nat'l Bd. of Examiners Inc.,* 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns,* 585 F.3d at 192. Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citing Beck, 848 F.3d at 270). In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't Of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

## IV.    Discussion

### A.  Corrigan's Request to Amend His Complaint

Rule 15 governs the amendment of pleadings. Rule 15(a)(1) provides: "A party may amend its pleading once as a matter of course no later than . . . 21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Rule 15(a)(2) states: "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."

Under Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." It is the Fourth Circuit's "policy to liberally allow amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)." *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010) (citing *Coral v. Gonse*, 330 F.2d 997, 998 (4th Cir. 1964)); *see also United States ex rel.*

*Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 197 (4th Cir. 2022) ("*MedCom*"); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Nevertheless, for a party seeking leave to amend a complaint, there are procedural hurdles. Local Rule 103.6(a) provides: "Whenever a party files a motion requesting leave to file an amended pleading, the original of the proposed amended pleading shall accompany the motion." Additionally, Local Rule 103.6(c) mandates that "the party filing an amended pleading file and serve (1) a clean copy of the amended pleading and (2) a copy of the amended pleading in which stricken material has been lined through or enclosed in brackets and new material has been underlined or set forth in bold-faced type."[5] Additionally, Local Rule 103.6(d) requires counsel to "attempt to obtain the consent of other counsel" to file an amended pleading, and to "state in the motion whether the consent of other counsel has been obtained."

Local Rule 103.6 seems to require the filing of a motion to amend.  But, as noted, Corrigan merely included a request to amend within his opposition to a motion to dismiss.  ECF 16-1 at 7. First, Corrigan seeks to correct the date on which Corrigan allegedly received the Right to Sue Notice.  *Id.* at 4.  Second, Corrigan asks the court to accept his amended complaint to show the "Notice requirement being complied with as of the April 3, 2025 Certified Letter."  *Id.* at 7.

As I see it, Corrigan failed to file a proper motion to amend his suit.  Nor did he include the proposed amended complaint.  *See, e.g., Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 628 (4th Cir. 2015) (affirming dismissal of an amended complaint because the moving party "did not file a separate motion requesting leave to amend her complaint or attach a proposed amended

---

[5] This Rule does not apply if the "the prior pleading was filed by a self-represented party" or the Court has ordered otherwise.  Local Rule 103.6(c).

complaint to her opposition brief", citing Local Rule 103.6);  *Warfield v. Warden*, DLB-21-990, 2022 WL 2116847, at *1 (D. Md. June 13, 2022) (denying a motion for leave to amend because the moving party did not file a proposed amended petition, as required by Local Rule 103.6).

Accordingly, I shall deny the request to amend, without prejudice, because it is procedurally deficient.  However, I will allow plaintiff to file a proper motion seeking leave to amend.  In any event, as explained, *infra*, both the LGTCA Notice and Right to Sue Letter are integral to Corrigan's claims.  Therefore, I will consider them in ruling on BPD's Motion.

### B.    Timeliness of Suit

The ADA requires a plaintiff to commence a court action within 90 days of receipt of his right to sue notice from the EEOC. *See* 42 U.S.C. § 12117 (ADA).  The 90-day period begins to run on the date that a claimant receives the right to sue notice.  *See*, *e.g.*, *Davis v. Va. Commonwealth Univ.*, 180 F.3d 626, 628 (4th Cir. 1999) ("Miss Davis received the right to sue letter on the second EEOC charge (disability, etc.) on October 1, 1996.  Thus, the 90 day statute of limitations began to run on October 1, 1996 and expired on December 30, 1996."); *Harvey v. City of New Police Dep't*, 813 F.2d 652, 653 (4th Cir. 1987) (finding 90 day limitations period under Title VII began to run on the day of receipt of a right-to-sue notice from the EEOC); *Cepada v. Bd. of Educ. of Baltimore Cnty.*, WDQ-10-0537, 2010 WL 3824221, at *3 (D. Md. Sept. 27, 2010) ("[T]he 90-day [limitations] period begins on the date the claimant receives the right-to-sue letter.").

Notably, the 90-day filing requirement is "'not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'" *Laber v. Harvey*, 438 F.3d 404, 429 n.25 (4th Cir. 2006) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)); *see Baldwin Cnty. Welcome Ctr. v. Brown*,

466 U.S. 147, 151 (1984) (finding Title VII plaintiff's failure to file suit within 90 days did not warrant equitable tolling); *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 321 (4th Cir. 2011) (affirming application of equitable tolling to ADA's 90 day filing requirement).

In the Fourth Circuit, "as a settled general rule, the burden of proving an affirmative defense is on the party asserting it." *McNeill v. Polk*, 476 F.3d 206, 220 n.3 (4th Cir. 2007). However, "[t]he plaintiff bears the burden of establishing the timeliness of the filing of [his] complaint whe[n] it is contested by the defendant." *Cepada v. Board of Education of Baltimore County*, WDQ-10-0537, 2010 WL 3824221, at *3 (D. Md. Sept. 27, 2010); *see Darden v. Cardinal Travel Center*, 493 F. Supp. 2d 773, 776 (W.D. Va. 2007).

The BPD claims that plaintiff is time barred from bringing his claims because he "failed to timely file" his Complaint "after the issuance of a Dismissal and Notice of Rights from the EEOC." ECF 9-1 at 4. Based on allegations in the Complaint, the BPD claims that "Plaintiff received notice of the EEOC's Right to Sue letter on August 29, 2024." *Id.* at 5 (citing ECF 1, ¶ 10). Therefore, the BPD calculates that Corrigan had a deadline of November 27, 2024, to file suit regarding the discrimination he reported to the EEOC. *Id.*

In his Complaint, Corrigan claims that he received his Right to Sue Notice on August 29, 2024. ECF 1, ¶ 10. In his Opposition, however, Corrigan claims that he received the Right to Sue Notice on September 4, 2024. ECF 15 at 1.

As discussed, Corrigan appended the Right to Sue Notice as an exhibit to the Opposition, and it is integral to his claim. *See* ECF 15-1; ECF 16-2. The date on the Right to Sue Notice is plainly September 4, 2024, not August 29, 2024. *Id.* at 1. From that date, Corrigan had 90 days to file suit, *i.e.*, he had a deadline of December 3, 2024.

25

BPD acknowledges that "Plaintiff attempted to file on December 3," but asserts that "his initial filing was rejected by the Deputy Clerk of the Court."  *Id.*  Therefore, BPD claims that plaintiff filed his suit on December 4, 2024.  ECF 9 at 5.

BPD is incorrect.  Suit was timely filed on December 3, 2024, as the Docket reflects.  The District of Maryland makes clear to litigants that, "[i]f a document is incorrectly filed," then "the Clerk's Office and/or an electronic letter will be sent to the parties indicating the document was filed in error." *Documents Filed in Error*, U.S. DIST. CT. MD., https://perma.cc/4KPG-Z8R2 (last accessed Oct. 20, 2025).  The Clerk had no issue with the filing of the Complaint.  However, the attachments to the Complaint were "not flattened."  *See* ECF 1.  As a result, the Clerk filed corrected versions of the attachments—not the suit—and stated that no further action was needed from Corrigan.  ECF 3.

In sum, BPD's timeliness contention is a specious one.  Corrigan timely filed his suit on December 3, 2024.

## C.  The Local Government Tort Claims Act

Defendant urges dismissal of Corrigan's claims under the Maryland Fair Employment Practices Act as to claims of disability discrimination (Count III), hostile work environment (Count IV), and constructive termination (Count VI), claiming Corrigan failed to comply with the LGTCA.  ECF 9-1 at 6 n.3; ECF 17 at 4–5.  As discussed, Corrigan filed suit on December 3, 2024.  ECF 1.  On April 3, 2025, plaintiff provided the Baltimore City Solicitor and the Maryland State Treasurer with notice of his claims.  ECF 15-2.

The LGTCA is contained in Title 5, Subtitle 3 of the Courts and Judicial Proceedings Article of the Maryland Code.  It provides, *inter alia*, that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions

committed by the employee within the scope of employment with the local government." C.J. §
5-303(b)(1). However, under C.J. § 5-304(b)(1), "an action for unliquidated damages may not be
brought against a local government or its employees unless the notice of the claim . . . is given
within 1 year after the injury." The notice must "be in writing and shall state the time, place, and
cause of the injury." C.J. § 5-304(b)(2). Moreover, notice "shall be given in person or by certified
mail, return receipt requested, bearing a postmark from the United States Postal Service, by the
claimant or the representative of the claimant." C.J. § 5-304(c)(1). As to Baltimore City, "the
Notice shall be given to the City Solicitor." C.J. 5-304(c)(3)(i).

Critically, C.J. § 5-304(d), titled "Waiver of notice requirement," provides:
"Notwithstanding the other provisions of this section, unless the defendant can affirmatively show
that its defense has been prejudiced by lack of required notice, upon motion and for good cause
shown the court may entertain the suit even though the required notice was not given."

C.J. § 5-304(e) is also pertinent. It states: "This section does not apply if, within 1 year
after the injury, the defendant local government has actual or constructive notice of:  1) The
claimant's injury; or 2) The defect or circumstances giving rise to the claimant's injury."

In addition, under C.J. § 5-303(b)(2), "[a] local government may not assert governmental
or sovereign immunity to avoid the duty to defend or indemnify . . . ." But, a local government
may assert a common law or statutory defense or immunity. C.J. § 3-303(e).

"With the enactment of the LGTCA, the [Maryland] Legislature sought to provide 'a
remedy for those injured by local government officers and employees, acting without malice in the
scope of their employment, while ensuring that the financial burden of compensation is carried by
the local government ultimately responsible for the public officials' acts.'" *Rios v. Montgomery
County,* 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (Hollander, J.) (quoting *Ashton*

27

*v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995)), *aff'd*, 386 Md. 104, 872 A.2d 1 (2005). The "purpose of the notice requirement is to apprise local governments of possible liability at a time when they can conduct their own investigation into the relevant facts, while evidence and the recollection of witnesses are still fresh." *Smith v. Danielczyk*, 400 Md. 98, 112, 928 A.2d 795, 804 (2007). By statute, the BPD is a local government entity that falls within the ambit of the LGTCA. *See* C.J. § 5-301(d)(21).

Where applicable, "notice is a condition precedent to the right to maintain an action for damages, and compliance with the notice provision should be alleged in the complaint as a substantive element of the cause of action." *Renn v. Bd. of Comm'rs of Charles Cty*, 352 F. Supp. 2d 599, 603 (D. Md. 2005). Courts have consistently enforced the LGTCA's notice requirements in the context of employment discrimination claims. *See, e.g.*, *Edwards v. Montgomery College*, TDC-17-3802, 2018 WL 4899311, at *7–9 (D. Md. Oct. 9, 2018); *Young v. Housing Auth. of Balt. City*, MJG-17-713, 2017 WL 5257127, at *6 (D. Md. Nov. 13, 2017).

Notably, "strict compliance with the notice provisions of the LGTCA is not always required; substantial compliance may suffice." *Renn*, 352 F.Supp.2d at 603 (internal quotation marks and citations omitted). Substantial compliance is satisfied "[w]here the purpose of the notice requirements is fulfilled, but not necessarily in a manner technically compliant with all of the terms of the statute." *Id.* (internal quotation marks and citations omitted). In the context of a claim of employment discrimination, some courts have held that notice of an EEOC charge constitutes substantial compliance, at least if notice is provided to the defendant by the LGTCA deadline and the charge provides "the identity of the claimant, the time and place of the event, the nature of the claim, and the Plaintiff's intent to pursue litigation." *Nelson v. City of Crisfield*, BEL-10-1816, 2010 WL 4455923, at *2 (D. Md. Nov. 5, 2010).

In *Truant v. Persuhn*, RDB-23-00579, 2023 WL 8600552 (D. Md. Dec. 12, 2023), the court explained, *id.* at *7 (quoting *Ellis v. Hous. Auth. of Baltimore City*, 436 Md. 331, 343 82 A.3d 161, 167 (2013)):

> Maryland courts have held that a plaintiff substantially complies with the LGTCA notice requirements when the plaintiff: (1) makes some kind of effort to provide the requisite notice; (2) in fact gives some kind of notice; (3) gives requisite and timely notice of facts and circumstances giving rise to the claim; and (4) provides notice that fulfills the LGTCA notice requirement's purpose of apprising the 'local government of its possible liability at a time when [the local government] could conduct its own investigation.

The doctrine of substantial compliance is "narrowly construed," however. *McDaniel v. Maryland*, RDB-10-0189, 2010 WL 3260007, at *4 (D. Md. Aug. 18, 2010). Nor does the substantial compliance doctrine provide "license to ignore the clear mandate" of the LGTCA. *Chinwuba v. Larsen*, 142 Md. App. 327, 355, 790 A.2d 83, 98 (2002), *rev'd on other grounds*, 377 Md. 92, 832 A.2d 193 (2003). Indeed, "[t]he doctrine of substantial compliance has no application to an outright failure to comply . . . ." *Simpson v. Moore*, 323 Md. 215, 228, 592 A.2d 1090, 1096 (1991).

"[T]he burden is on the claimant to show "'good cause'" for failure to adhere to the LGTCA. *Prince George's Cnty. v. Longtin*, 419 Md. 450, 467 19 A.3d 859, 869 (2011). "The test for whether good causes exists" under C.J. § 5-304(d) "is whether the plaintiff pursued the claim 'with the degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances.'" *Rico v. Green*, GJH-18-1949, 2021 WL 1215775, at *8 (D. Md. Mar. 30, 2021) (quoting *Heron v. Strader*, 361 Md. 258, 271, 761 A.2d 56, 63 (2000)). If the plaintiff establishes good cause, the burden falls on the local government to "'affirmatively show that its defense has been prejudiced by lack of required notice[.]'" *Id.* (quoting C.J. § 5-304(d)). If the defendant cannot make this showing, then the court "may entertain the suit even though the required notice was not given." C.J. § 5-304(d).

As stated, Corrigan appended a copy of his LGTCA Notice to his Opposition.  ECF 15-2; ECF 16-3.  It is dated April 3, 2025, and it is addressed to the Maryland State Treasurer and the Baltimore City Solicitor. ECF 15-2; ECF 16-3.  As explained, the LGTCA Notice is integral to the Complaint because it gives rise to the rights asserted.

The content of the LGTCA Notice is sufficient to meet the requirements of the LGTCA.  It is addressed to the appropriate City official under the LGTCA.  C.J. § 5-304(c)(3)(i); *see also Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 315 (D. Md. 2020) (explaining that to comply with the LGTCA, the plaintiff, who sued the BPD, "must serve notice of it upon the Baltimore City Solicitor").  It identifies Corrigan, notes that Corrigan "has commenced an action for disability discrimination" (*id.* at 1), and states that he "intends to bring a claim."  *Id.* at 7.  It also describes in detail the treatment Corrigan allegedly experienced while working at the BPD, including dates of alleged harassment.  ECF 15-2 at 1–8.  Therefore, in substance, the LGTCA Notice fulfills the requirements of the LGTCA.

Nevertheless, the BPD argues that there are several deficiencies in regard to plaintiff's compliance with the LGTCA.  First, according to BPD, Corrigan did not plead compliance with the LGTCA in his Complaint.  Second, the BPD contends that Corrigan did not file the LGTCA Notice within one year of when Corrigan's cause of action accrued.  Third, Corrigan sent the LGTCA Notice in April 2025, four months after he commenced suit, which the BPD asserts constitutes failure to comply with the LGTCA.  I discuss each of these alleged deficiencies, in turn

### 1.  Pleading of LGTCA Compliance in the Complaint

In the Complaint, Corrigan does not allege compliance with the LGTCA.  In *Hansen v. City of Laurel, Maryland*, 420 Md. 670, 694, 25 A.3d 122, 137 (2011), the Maryland Court of

Appeals[6] said: "A plaintiff must not only satisfy the notice requirement strictly or substantially, but also plead such satisfaction in his/her complaint. If a plaintiff omits this step, he or she is subject to a motion to dismiss, for instance, based on a failure to state a claim upon which relief can be granted." *Id.* at 694, 25 A.3d at 137.

The requirement of pleading compliance with the LGTCA seems to have been fashioned by the Maryland Court of Appeals; the statute itself does not contain such a requirement. *See Hansen*, 420 Md. at 684–85, 25 A.3d at 131–32 ("[O]ur precedent seems to require that tort claimants plead affirmatively, albeit generally, this *particular* condition precedent, *i.e.,* the LGTCA notice requirement.") (emphasis in original). Regardless, Corrigan's omission is not fatal to his fulfillment of the notice requirement. In *Hansen*, 420 Md. at 690, 25 A.3d at 134–35, the petitioner appended documents to his response to a motion to dismiss as proof of his compliance with the LGTCA. The court "[a]ssum[ed], without deciding, that appending such documents in this manner and at that point in a case may compensate for a plaintiff's failure to plead satisfaction of the LGTCA notice provision." *Id.*, 420 Md. at 690, 25 A.3d at 135.

The court's analysis in *LaPier v. Prince George's Cnty., Md.*, AW-10-2851, 2011 WL 4501372 (D. Md. Sept. 27, 2011), is instructive. There, defendants moved to dismiss for failure to state a claim, because the plaintiff failed to plead compliance with the LGTCA in his complaint. *Id.* at *1, *7. The *LaPier* Court described actions showing an intent to comply with the pleading

---

[6] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. I shall refer to the courts by the names that were in effect when the cited decisions were issued.

requirement of the notice provision as "equitable considerations" that could allow a court to find that a plaintiff had satisfied the notice requirement, despite failure to plead compliance in the complaint. *Id.* at *7–8. However, because the plaintiff "failed to move to amend his complaint, voluntarily dismiss his case, or take any other step evidencing the intent to comply with the LGTCA's notice provision," *id.* at *8, the court found that "none of the equitable considerations" were present. The court dismissed the plaintiff's claim. *Id.*

In *Lanford v. Prince George's Cnty., MD*, 199 F. Supp. 2d 297, 303 (D. Md. 2002), the plaintiff did not allege compliance with the LGTCA in his complaint or proposed amended complaint. Therefore, the defendants sought to dismiss, contending that the plaintiff had "failed properly to give notice under the LGTCA." *Id.* The plaintiff responded with an "affidavit of his former counsel, attesting to the hand delivery of a letter" to the relevant county official. *Id.* Based on the content of the letter, the court concluded that the plaintiff had satisfied the notice requirement as to one of two officials the plaintiff had sued. *Id.* at 304. Thus, the plaintiff's failure to plead compliance with the LGTCA did not bar him from satisfaction of the LGTCA's notice provision.

The equitable considerations that were absent in *Hansen*, 420 Md. 670, 25 A.3d 122, and in *LaPier*, 2011 WL 4501, are present here. In the Opposition, Corrigan asked to amend his Complaint to allege compliance with the LGTCA requirement. ECF 15 at 4; ECF 16-1 at 7; ECF 16-4 at 3 (redline proposed amended complaint) ("On April 3, 2025, in compliance with the Local Government Tort Claims Act, a Notice of Claim was certified mailed to the Maryland State Treasurer and the Baltimore City Solicitor."). And, he appended his LGTCA Notice as an exhibit to his Opposition, which the Court is entitled to consider. It plainly establishes that Corrigan provided the required LGTCA Notice.

Therefore, I am satisfied that Corrigan has substantially satisfied the requirement that plaintiff plead compliance with the LGTCA notice provision in the Complaint.

## 2.  Notice within One Year of Injury

Under the LGTCA, the complainant must give notice of his claims within one year of injury.  C.J. § 5-304(b)(1).

As indicated, Corrigan lodges three claims under MFEPA: disability discrimination (Count III); hostile work environment (Count IV); and constructive termination (Count VI).  The BPD argues that the notice clock began to run on January 23, 2024, because "the facts giving rise to Plaintiff's claim" began on that date.  ECF 17 at 4 (citing ECF 1, ¶¶ 1–28).  Plaintiff alleges that on that date, Sergeant Parlett "made a disturbing comment implying the Plaintiff would 'swallow a pistol' if he remained at the front desk."  ECF 1, ¶ 28.  This is the earliest instance of demeaning treatment that Corrigan alleges in his Complaint that is associated with a specific date.

Corrigan makes conflicting arguments as to the date of injury that the Court should consider.  In his first Opposition to the Motion (ECF 15), Corrigan asserts that the date of injury for purposes of the LGTCA's notice requirement is May 31, 2024, because "allegations in this complaint go" as far as that date.  *Id.* at 3.  Then, in his second Opposition to the Motion (ECF 16-1), plaintiff argues that he has satisfied the one-year period because he sent the LGTCA Notice, on April 3, 2025, "within one-year of the ultimate injury–Plaintiff's constructive discharge on July 1, 2024[.]"  *Id.* at 6.

As noted, plaintiff filed suit on December 3, 2024.  *See* Docket.  Thus, by the time that plaintiff sent the LGTCA Notice on April 3, 2025, he had already filed suit.  But, as mentioned, the statute does not expressly require a claimant to provide notice *before* filing suit.  Rather, notice must be provided within one year of injury.  C.J. § 304(b)(1).

The Maryland Court of Appeals has ruled that for purposes of determining timely compliance with the LGTCA, the court must consider "when" the plaintiff's "causes of action arose, *i.e.,* when the legally operative facts permitting the filing of" the plaintiff's "claims came into existence." *Heron*, 361 Md. at 264, 761 A.2d at 59; *see Johnson*, 452 F. Supp. 3d at 315. To make this determination, the court must "examine the elements of the cause of action, since . . . a cause of action is said to have arisen 'when facts exist to support each element.'" *Id.* (citation omitted) (alterations in original). In other words, the operative analysis concerns accrual of a cause of action, not the filing of a lawsuit.

The MFEPA is an analogue to the ADA. MFEPA "authorizes the same expansive relief and recovery of damages as provided under the ADA *and* provides specific legal protections that mirror ADA protections." *Bales v. Maryland Judiciary/Admin. Off. of the Cts.*, JFM-15-03293, 2016 WL 6879902, at *7 (D. Md. Nov. 22, 2016) (emphasis in original). It "contains functionally identical prohibitions and is evaluated under the same framework as the Americans with Disabilities Act, 42 U.S.C. § 12112(a)." *Destiny Charity Rose Teel v. Maryland Nat. Treatment Sols., LLC*, RDB-23-1694, 2024 WL 1075421, at *4 (D. Md. Mar. 12, 2024) (citing *Miller*, 813 F. App'x at 874, and *Adkins*, 448 Md. 197, 218–19, 137 A.3d 211, 223–24); *see Allen v. Discovery Commc'ns, LLC*, PWG-15-1817, 2016 WL 5404558, at *7 (D. Md. Sept. 28, 2016) ("In addition to being the Maryland analogue to Title VII, 'the MFEPA has been labeled the 'Maryland State analogue to the ADA.'") (citation omitted).

The MEFPA, S.G. § 20-606(a)(1), specifies, in pertinent part, that "an employer may not: (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . the individual's . . . disability . . . ." In addition, S.G. § 20-606(a)(4) bars an employer from

"fail[ing] or refus[ing] to make a reasonable accommodation for the known disability of an otherwise qualified employee."

A prima facie case of employment-related disability discrimination under MFEPA requires an employee to show: "(1) that he or she had a disability; (2) that notwithstanding the disability, he or she was otherwise qualified for the employment, with or without reasonable accommodation; and (3) that he or she was excluded from employment on the basis of his or her disability." *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 239, 137 A.3d 211, 236 (2016).

S.G. § 20-601(b) defines disability as follows (emphasis added):

(1) "Disability" means: (i) 1. a physical disability, infirmity, malformation, or disfigurement that is caused by bodily injury, birth defect, or illness, including epilepsy; or 2. a mental impairment or deficiency; (ii) a record of having a physical or mental impairment as otherwise defined under this subsection; or (iii) *being regarded as having a physical or mental impairment* as otherwise defined under this subsection. (2) "Disability" includes: (i) 1. any degree of paralysis, amputation, or lack of physical coordination; 2. blindness or visual impairment; 3. deafness or hearing impairment; 4. muteness or speech impediment; and 5. physical reliance on a service animal, wheelchair, or other remedial appliance or device; and (ii) intellectual and any other mental impairment or deficiency that may have necessitated remedial or special education and related services.

The Maryland General Assembly, following the path charted by Congress in its amendments to the ADA, expanded the definition of disability to include "those who are 'regarded as' having a physical or mental impairment." (citation omitted). *Adkins v. Peninsula Reg'l Med. Ct*r., 224 Md. App. 115, 133, 119 A.3d 146, 157 (2015), *aff'd*, 448 Md. 197, 137 A.3d 211 (2016). To qualify as a disability, the perceived impairment does not need to "limit a major life activity." *Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 876 (4th Cir. 2020) (describing what qualifies as being regarded as having a disability under the ADA Amendments Act). However, "a plaintiff cannot ultimately succeed on a regarded as [having a disability] claim if the impairment is 'transitory and minor.'" *Id.* (quoting 42 U.S.C. § 12102(3)(B)). And, "even if an individual is

not in fact disabled, if his employer believes otherwise, then the individual is protected against

discrimination on account of the employer's mistaken belief." *Equal Emp. Opportunity Comm'n*

*v. Optimal Sols. & Techs., Inc.*, 422 F. Supp. 3d 1037, 1045 (D. Md. 2019).

The Code of Maryland Regulations ("COMAR") includes in its definition of disability the

following, COMAR §§ 14.03.02.02(6(d)), (6(e)):

> (d) Being regarded as having a physical . . . impairment  . . . including one that:
> (i) Does not substantially limit major life activities, if the individual is treated by
> a covered entity as having such a limitation; or (ii) Substantially limits major life
> activities as a result of the attitude of the covered entity or of others towards the
> impairment; or (e) Being treated by a covered entity as having an impairment,
> even if there is no physical or mental impairment.

"Walking" and "working" are among the major life activities that the regulations list.  COMAR §§

14.03.02.02(7).

Corrigan claims to have a "slight limp."  However, he alleges that it "does not impair" his

"ability to walk, run, or perform any of the essential duties required of him as a police officer."

ECF 1, ¶ 22.  Nonetheless, beginning on August 21, 2023, during plaintiff's training at the police

academy, a sergeant "expressed concerns" about Corrigan's limp, calling it a "'perceived

disability.'"  *Id.* ¶ 21.

During August and September of 2023, plaintiff underwent several physical examinations

for the BPD and was placed on "light-duty permanently, with no hope of ever returning to the

police academy and becoming a certified police officer[.]"  *Id.* ¶¶ 24–26.  Corrigan claims that he

was "removed from the academy and relegated to sitting at the front desk with no meaningful job

responsibilities for 127 days."  *Id.* ¶ 27.  Yet, Corrigan maintains that he has the physical capacity

to perform all the duties of a police officer.

For purposes of determining when the facts giving rise to plaintiff's various State claims

arose, plaintiff has alleged facts sufficient to show that, at least by September 2023, he was

perceived to have a disability.  At that time, plaintiff underwent his last medical evaluation and was placed on light duty status "permanently, with no hope of ever returning to the police academy and becoming a certified police officer[.]"  ECF 1, ¶ 26.  There is no indication that BPD considered Corrigan's limp as temporary because he was placed on permanent light duty status after his final medical evaluation in September 2023.  Additionally, the Department referred to the limp as a "perceived disability" that interfered with plaintiff's ability to work as a police officer.

But, the timeliness analysis for claims of "discrete acts of discrimination" and hostile work environment "differ[.]"  *Destiny Charity Rose Teel*, 2024 WL 1075421 at *4.  In particular, "[h]ostile environment claims are different in kind from discrete acts" because a hostile environment claim "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  The Supreme Court has said, *id.* at 113: "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act."  Moreover, the Supreme Court has said, *id.* at 117: "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."

Corrigan brings claims for hostile work environment discrimination under the ADA (Count II) and MFEPA (Count IV).  ECF 1, ¶¶ 46–53, 67–73.[7]  He alleges that the BPD subjected him to a hostile work environment "based on his perceived disability."  ECF 1, ¶ 47.  According to plaintiff, he was subject to "continuous ridicule, mockery, and demeaning comments[.]"  *Id.*

---

[7] In plaintiff's description of his hostile work environment claim under MFEPA, Corrigan "realleges and incorporates by reference" allegations concerning the ADA claim.  ECF 1, ¶ 67.

Specifically, Corrigan points to the following, ECF 1, ¶ 47:

(a) The continuous ridicule, mockery, and demeaning comments regarding Plaintiff's perceived disability, including but not limited to the use of derogatory nicknames such as "DOT Corrigan," "Crip Walk Corrigan," "Light Duty Luke," "The Statue of Limperty," and "Limp Bizkit";

(b) The creation and circulation of a "meme" mocking Plaintiff's perceived disability, which was shared in a group chat among officers and supervisors;

(c) The failure of supervisors, including Sgt. Shawn Parlett and Sgt. Adriel Nuñez, to intervene or take corrective actions when Plaintiff was subjected to verbal and physical harassment;

(d) The unprofessional and inappropriate comments made by Plaintiff's colleagues, including Sgt. Shawn Parlett's insinuation that Plaintiff would "swallow a pistol" and Officer Rhys Dacuycuy's mocking gestures and remarks about Plaintiff's perceived condition.

To state a claim for hostile work environment under the ADA,  an analogue to MFEPA, a plaintiff must show: "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer."  *Turner v. Wal-Mart Assocs., Inc.,* 2025 WL 2049054, at *2 (4th Cir. July 22, 2025) (quotation marks and citation omitted); *see Britt v. DeJoy,* 2022 WL 4280495, at *3 (4th Cir. Sept. 14, 2022) (per curiam); *see also Dailey v. Elkton SNF, LLC*, JMC-25-1828, 2025 WL 2822993, at *4 (D. Md. Oct. 3, 2025) ("[A] plaintiff must allege (1) that [he] is a qualified individual with a disability, (2) that [he] was subject to unwelcome harassment, (3) the harassment was based on [his] disability, (4) the harassment was severe or pervasive, and (5) some factual basis exists to impute liability for the harassment to the employer.").

"A hostile work environment exists only when the workplace is so 'permeated with discriminatory intimidation, ridicule, and insult,' that it 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781

(4th Cir. 2023) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations removed)); *see also Laurent-Workman*, 54 F.4th at 210 (quoting *Harris*, 510 U.S. at 21). "The continuing violation theory allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination, *i.e.*, when the incidents make up part of a hostile work environment claim." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007); *see Morgan*, 536 U.S. at 117 ("It does not matter . . . [if] some of the component acts of the hostile work environment fall outside the statutory time period.") Under the continuing violation theory, "[i]f one act in a continuous history of discriminatory conduct falls within the charge filing period, then acts that are plausibly or sufficiently related to that act which fall outside the filing period may be considered for purposes of liability." *Lewis v. Norfolk S. Corp.*, 271 F. Supp. 2d 807, 812 (E.D. Va. 2003).

Of import, the date of termination can be considered in determining the "last possible act that could conceivably support a claim for a hostile work environment[.]" *Purcell v. Mission Hosps.*, LHT-07-385, 2008 WL 5120620, at *5 (W.D.N.C. Dec. 4, 2008); *see Petway v. Doyle Printing & Offset Co.*, PJM-12-3731, 2013 WL 4454633, at *2 (D. Md. Aug. 15, 2013) ("[Plaintiff] was terminated from his employment and the last day he could have been subjected to a hostile work environment was [the date of his termination]."); *but see Green v. Brennan,* 578 U.S. 547, 574 n.5 (2016) (Alito, J., concurring) ("If the resignation was prompted by an intolerable hostile work environment, the limitations period would run from any act that contributed to the hostile work environment.")

As noted, Corrigan claims that he "was mocked and humiliated by fellow officers both in leadership and academy student status." ECF 1, ¶ 27. The latest date for which Corrigan alleges that he was subject to derogatory remarks is May 31, 2024. *Id.* ¶ 33. Then, on July 1, 2024,

Corrigan resigned from the BPD, claiming he was "unable to endure the toxic and hostile work environment." *Id.* ¶ 37.

The Complaint sets forth sufficient facts that, if proven, establish a hostile work environment that occurred well within one year of the LGTCA Notice sent on April 3, 2025. *See, e.g.*, ECF 1, ¶¶ 27–37. Moreover, BPD does not dispute that Count IV sufficiently alleges that plaintiff was the recipient of unwelcome conduct on the basis of his disability, or that this conduct was sufficiently severe or pervasive to alter Corrigan's conditions of employment, imputable to the employer. *See Boyer-Liberto*, 786 F.3d at 277. Therefore, I am satisfied that Count IV pleads a timely hostile work environment claim under MFEPA.

As to plaintiff's constructive termination claim, he asserts that his resignation on July 1, 2024, was "not voluntary but was the direct result of Defendant's discriminatory conduct and the creation of a work environment so intolerable that resignation was the only reasonable option." *Id.* ¶ 82. "A constructive discharge occurs when an employer creates intolerable working conditions in a deliberate effort to force the employee to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994); *see Strickland v. Moritz,* 149 F.4th 378, 396–97 (4th Cir. 2025).

The Supreme Court has explained: "For a constructive discharge, the claim does not exist until the employee resigns." *Green v. Brennan*, 578 U.S. 547, 562 (2016). Corrigan's resignation on July 1, 2024, is the operative date. Because Corrigan sent his LGTCA Notice on April 3, 2025, the notice was submitted within a year of the date the claim accrued. Therefore, Corrigan's constructive discharge claim is timely.

As to plaintiff's disability discrimination claim, Corrigan identifies five ways in which the BPD "discriminated" against him "based on his perceived disability." He states, ECF 1, ¶ 58:

(a) Subjecting Plaintiff to unfavorable treatment, including being placed on light-duty status and excluded from meaningful work due to the perceived disability;

(b) Denying Plaintiff a reasonable accommodation to perform his job duties in a full-duty capacity despite medical evidence indicating that Plaintiff was capable of doing so; (c) Placing Plaintiff on indefinite light-duty status despite medical evaluations indicating he was fit for full-duty status; (d) Failing to address the harassment and derogatory remarks made by other officers regarding Plaintiff's perceived disability; (e) Encouraging Plaintiff to resign from his position and pursue civilian roles due to his perceived disability, which were ultimately denied.

The continuing violation theory that applies to a hostile work environment claim does not apply to discrete discriminatory acts. And, as noted, courts have not applied the same timeliness analysis to general claims of disability discrimination under MFEPA. *See, e.g., Destiny Charity Rose Teel*, 2024 WL 1075421, at *2, *4 (concluding that "[a]ny alleged acts of discrimination that took place" outside the period of limitations "cannot form the basis of [plaintiff's] MFEPA discrimination claim").

Some of the discriminatory conduct that Corrigan complains about began in September 2023, after he was placed on light-duty status. *See* ECF 1, ¶¶ 26–37. Any of the discrete acts of discriminatory conduct that allegedly occurred before April 3, 2024, are time barred and cannot form the basis of Corrigan's MFEPA disability discrimination claim (Count III). But, Corrigan also describes five hostile and discriminatory interactions that occurred between April 10, 2024, and May 2024, and culminated in his resignation on July 1, 2024. *Id.* ¶¶ 29–37. To the extent that Corrigan seeks to bring a disability discrimination claim under MFEPA, he may pursue an action based on conduct dating from April 2024.

In sum, Corrigan's MFEPA claims of hostile work environment (Count IV) and constructive termination (Count V) were lodged within the one-year limitations period laid out in the LGTCA. As to the MFEPA disability discrimination claim (Count III), Corrigan may rely on conduct that occurred after April 3, 2024, when limitations began to run under the LGTCA.

### 3.   Service of Notice After Suit was Filed

The LGTCA Notice provision is regarded as a "pre-suit notice requirement[.]"  *Hansen*, 420 Md. at  672, 25 A.3d at 123; *see Huggins v. Prince George's Cnty., Md.*, 683 F.3d 525, 532 (4th Cir. 2012); *see also Williams v. Morgan State Univ.,* GLR-19-5, 2021 WL 3144890, at *5 (D. Md. July 26, 2021) (describing the LGTCA notice provision as a "pre-suit notice requirement[]"), *aff'd,*  2023 WL 6491919 (4th Cir. Oct. 5, 2023).   It is intended to ensure that the local government "has sufficient actual notice to perform a proper and timely investigation."' *Faulk v. Ewing*, 371 Md. 284, 302, 808 A.2d 1262, 1274 (2002) (quoting *Moore v. Norouzi*, 371 Md. 154, 178, 807 A.2d 632, 646 (2002)).   Moreover, "to substantially comply with the notice requirement, a claimant must provide some indication, either explicitly or implicitly, that a *subsequent suit* for unliquidated damages *will follow*."   *Dehn Motor Sales, LLC v. Schultz*, 439 Md. 460, 486–87, 96 A.3d 221, 237 (2014) (emphasis added).

Failure to provide notice before filing suit has been the basis for dismissal of suit.   For example, in *Gyamerah v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, AAQ-24-CV-00575, 2024 WL 4361854, at *3 n.3, *7 (D. Md. Oct. 1, 2024), Magistrate Judge Quereshi granted defendant's motion to dismiss, without prejudice, because of the plaintiff's "failure to plead compliance with the LGTCA", but noted that plaintiff could "seek leave to amend his Complaint . . . if he, in fact, provided notice *pre-suit*."   (Emphasis added).   Similarly, Magistrate Judge Sullivan found that the plaintiff had not substantially complied with the LGTCA notice provision, pointing to the plaintiff's failure "to provide notice of his intent to make any claims against the County, as required by the LGTCA, *before he filed his Complaint*."   *Butler v. Prince George's Cnty., MD*, TJS-19-1509, 2019 WL 6717846, at *5 (D. Md. Dec. 10, 2019) (emphasis added).

As indicated, the text of the LGTCA does not actually require filing of the required notice *before* suit is filed. *Smith,* 400 Md. 98, 111–12, 928 A.2d 795, 803–04, is instructive. There, the Maryland Court of Appeals determined that the plaintiffs had timely provided the requisite notice to the BPD defendants, although notice was provided after suit was filed. This was because notice was provided within the 180-day statutory window that the LGTCA required. The court stated that even if, "in a purely technical sense, the notice should precede the complaint", the defendants had not alleged "much less affirmatively show[n], that they were prejudiced." *Id.* at 112–13, 928 A.2d 795, 804. The court concluded that "the fact that the complaint was filed prior to the sending of the notice does not constitute a ground for dismissing the complaint." *Id.,* 400 Md. 98, 112, 928 A.2d 795, 804.

Courts have found that the LGTCA notice provision has been substantially satisfied even when "notice was not given before the original filing of suit." *Swagler v. Harford Cnty.,* RDB-08-2289, 2009 WL 10682452, at *5 (D. Md. June 29, 2009). To determine whether a plaintiff who has served notice of his claim after filing suit has substantially complied with the LGTCA, courts have considered whether the local entity has "been informed of the necessary facts to conduct a proper investigation", thereby fulfilling the purpose of the statute. *Dehn Motor Sales, LLC*, 439 Md. at 483, 96 A.3d at 235.

In *Swagler,* 2009 WL 10682452, at *5, the court found that the plaintiffs had satisfied the LGTCA's statutory notice requirements when, after suit was filed, they provided notice via a cover letter enclosing a copy of the plaintiffs' complaint. The court reasoned that the plaintiffs had provided notice within the statutory period required to give notice under the LGTCA, which at the time was 180 days. The court considered the "purpose of the LGTCA's notice requirements—to ensure that the local government is apprised of its possible liability in order to conduct an

investigation[.]"    *Id.*    It concluded that the plaintiffs' service of the complaint and formal cover

letter within 180 days of the injury, the statutory time limit to provide LGTCA notice at the time,

had provided sufficient time to fulfill the purpose of the statute.    *Id.*

The plaintiffs in *Swagler,* 2009 WL 10682452, at *5, sent the LTGCA notice the same day

that they filed their complaint.    The plaintiffs in *Smith,* 400 Md. 98, 111, 928 A.2d 795, 803, sent

their LGTCA notice one month after they filed their complaint, but within the 180-day statutory

window that was operative at the time.    Here, suit was filed on December 3, 2024.    *See* Docket.

Four months later, on April 3, 2025, plaintiff provided the LGTCA Notice.    ECF 15-2.    Under the

reasoning of *Swagler* and *Smith,* Corrigan's LGTCA Notice was timely because it was provided

within the statutory time frame.    *See* C.J. § 5-304(b)(1).

C.J. § 5-304(e) is also pertinent.    It provides that the notice requirement does not apply if,

"within 1 year after the injury, the defendant local government has actual or constructive notice

of: (1) The claimant's injury; or (2) The defect or circumstances giving rise to the claimant's

injury."    In other words, this provision "relaxes the notice requirement[.]"    *Saunders v. Baltimore

City Police Dep't*, CCB-19-551, 2020 WL 1505697, at *5 n.8 (D. Md. Mar. 30, 2020).

Defendant complains that the "BPD has been prejudiced by the delay in opportunity to

conduct an investigation into the allegations."    ECF 17 at 4.    BPD seems to rely only on the fact

that Corrigan provided notice of his claims, pursuant to the LGTCA, after filing his lawsuit.    *Id.*

I am not persuaded that BPD lacked sufficient notice of Corrigan's claims or was

prejudiced by receipt of the LGTCA Notice after suit was filed.    As discussed, for purposes of

Corrigan's MFEPA hostile work environment claim (Count IV) and Corrigan's MFEPA

constructive termination claim, his claims accrued on the date of his resignation, July 1, 2024.    *See*

ECF 1, ¶ 37.    The Complaint, filed on December 3, 2024, contained all the information that would

be required in an LGTCA notice.  About a month after suit was filed, on January 7, 2025, Corrigan

sent BPD a "request to waive service of a summons in this action along with a copy of the

complaint", which BPD waived that day.  ECF 7.  Therefore, as of January 7, 2025, and well within

the one-year statutory period, BPD was on notice of the claims and could have begun an

investigation to determine whether Corrigan had been subjected to disability discrimination and/or

a hostile work environment while training with the BPD.

Corrigan filed his Complaint five months after his resignation, and well within the one-

year limitations period.  The mere fact that Corrigan filed his suit before filing his LGTCA Notice

does not warrant dismissal of his State law claims.

### D.  State Sovereign Immunity

Pursuant to Fed. R. Civ. P. 12(b)(1), defendant contends that this Court must dismiss

Corrigan's claims because the BPD "'exists as an agency of the State, and therefore enjoys the

common law sovereign immunity from tort liability of a State agency.'"  ECF 9-1 at 6–7 (quoting

*Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 313, 780 A.2d 410, 428 (2001)).  In a total of

about three pages devoted to this complex issue (ECF 9-1 at 6–9), BPD contends that it enjoys

State sovereign immunity as to plaintiff's MFEPA claims, and Maryland has not waived BPD's

"total immunity."  ECF 9-1 at 7.

Plaintiff counters that sovereign immunity should not apply in this case because this is an

employment discrimination case brought by a police officer.  ECF 15 at 3.  He asserts: "This is not

a case of a civilian bringing a claim against a law enforcement entity–this is a case about an

aggrieved employee bringing an employment and disability discrimination complaint against his

employer for its actions against him in the scope of employment."  *Id*.  Furthermore, he argues that

the Maryland General Assembly has waived State sovereign immunity for employment

discrimination cases brought under MFEPA, citing S.G. § 20-903, which provides: "The State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under this title." ECF 16-1 at 6–7.

Neither side addresses recent legislative enactments, discussed *infra*, that have altered BPD's prior status as a State agency. This is a striking omission.

Sovereign immunity is "a weighty principle, foundational to our constitutional system." *Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021). "In a line, sovereign immunity is a sovereign's privilege 'not to be amenable to the suit of an individual without its consent.'" *Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 428 (4th Cir. 2025) (quoting *Hans v. Louisiana*, 134 U.S. 1, 3).

Of note, State sovereign immunity and Eleventh Amendment immunity are "related but not identical concepts[.]" *Stewart v. North Carolina*, 393 F.3d 484, 487 (4th Cir. 2005). In its Motion, BPD only asserts that it is entitled to "common law state sovereign immunity." ECF 9-1 at 7. Therefore, I will confine my analysis to State sovereign immunity.

The doctrine of State sovereign immunity is "firmly embedded in the law of Maryland." *Katz v. Wash. Suburban Sanitary Comm'n*, 284 Md. 503, 512-13, 397 A.2d 1027, 1032-33 (1979); *see Bd. of Educ. of Balt. Cty. v. Zimmer-Rubert*, 409 Md. 200, 240, 973 A.2d 233, 211 (2009) (describing State sovereign immunity as "a rule of policy which protects the State from burdensome interference with its governmental functions and preserves its control over State agencies and funds") (citation and internal quotation marks omitted). And, State sovereign immunity "'is applicable not only to the State itself, but also to its agencies and instrumentalities . . . .'" *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 709, 990 A.2d 1048, 1058 (2010) (quoting *Katz*, 284 Md. at 507-08, 397 A.2d at 1030).

46

Therefore, unless the Maryland General Assembly has waived immunity, State sovereign immunity bars an individual from maintaining a suit for money damages against the State of Maryland or one of its agencies for violations of State law. *See State v. Sharafeldin*, 382 Md. 129, 140, 854 A.2d 1208, 1214 (2004); *Cherkes*, 140 Md. App. at 306, 780 A.2d at 424; *see also Samuels v. Tschechtelin*, 135 Md. App. 483, 522, 763 A.2d 209, 230 (2000) (Hollander, J.). Notably, this "immunity protects the State not only from damage actions for ordinary torts but also from such actions for State constitutional torts." *Cherkes*, 140 Md. App. at 306, 780 A.2d at 424 (citing *Ritchie v. Donnelly*, 324 Md. 344, 369, 597 A.2d 432, 444 (1991)).

BPD was long recognized as a State agency.  But, in recent years, BPD's status as a State agency has changed.

In 1860, the Maryland legislature took control of the Baltimore Police Department, which had previously been "under municipal control[.]" *Johnson v. Mayor & City Council of Baltimore*, 233 Md. App. 43, 54, 161 A.3d 95, 101 (2017).  Even as the "State's role in supervising the Baltimore Police Department . . . lessened" in the coming years, the State courts of Maryland held that the "case law" was "absolutely clear that the Baltimore Police Department" was a "State agency." *Id.; see also Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 323, 780 A.2d 410, 434 (2001) ("[T]he [Baltimore City Police Department] is a State agency that has common law State sovereign immunity").  For example, in *Mayor & City Council of Baltimore v. Clark*, 404 Md. 13, 944 A.2d 1122 (2008), the Maryland high court said, *id.* at 28, 944 A.2d at 1131: "[N]otwithstanding the Mayor's role in appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency." *See also Ashton v. Brown*, 339 Md. 70, 104 n. 18, 660 A.2d 447, 464 n. 18 (1995) (stating that "the Baltimore City Police Department, for purposes of Maryland law, is a state agency").

However, in the State's general election of November 2022, voters in the City of Baltimore approved the transfer of control over the BPD from the State of Maryland to the Mayor and City Council of Baltimore. The transfer was to take effect on January 1, 2023. *See* Paul Gessler, *Baltimore votes for term limits, control of city's police department*, WJZ NEWS (Nov. 9, 2022), https://perma.cc/W7JL-Q6M4. As a result of the electoral decision, Public Local Laws of Maryland ("PLL"), Art. 4, § 16-2(a) named the BPD as "an agency and instrumentality of the City of Baltimore." PLL, Art. 4, § 16 (Editor's Note).[8]

Since then, control of the BPD has shifted from the State to the Mayor and City Council of Baltimore. In January 2024, the Mayor signed into law amendments to the Baltimore City Charter and Baltimore City Code, establishing the BPD as a component part of Baltimore City government, contingent on voters' approval of a November 2024 ballot initiative. Baltimore City Council Bill 23-0445; City Council Bill 23-0449; *see Legislation Details File # 23-0445*, CITY OF BALT. (last accessed on Nov. 7, 2025), https://perma.cc/MNQ9-8K53; *see Legislation Details File # 23-0449*, CITY OF BALT. (last accessed on Nov. 21, 2025), https://perma.cc/F2XP-2SFN. At the time, the Mayor stated: "The fight for local control of BPD has been one of my top priorities . . . . By signing today's bills, we take one more crucial step towards making local control a reality[.]" *Mayor Scott Signs Bills Enshrining Baltimore Police Department into City's Charter and Code,* MAYOR BALT. CITY (Jan. 24, 2024), https://perma.cc/6JRP-MZ3Q. Additionally, the Maryland General Assembly passed a law removing a phrase from the Baltimore City Charter to provide for local control of the police, contingent on the results of the November 2024 ballot initiative. Md. House Bill 732 (2024); Md. Senate Bill 894 (2024). The Governor approved both Bills. *Maryland House*

---

[8] Subsequently, with other legislative enactments, discussed *infra*, Baltimore City's "express powers serve as the authority" for the Police Ordinances of the City Code, and so references to the BPD in the PLL were repealed. PLL, Art. 4, § 16 (Editor's Note).

*Bill 732;* LEGISCAN (last accessed Jan. 1, 2026), https://perma.cc/SMT8-WH2J; *Maryland Senate*

*Bill 894,* LEGISCAN (last accessed Jan. 1, 2026), https://perma.cc/M84U-3GC5.

In November 2024, Baltimoreans voted to amend the City Charter, "establishing the

Baltimore City Police Department as an agency of the mayor and city council." *Baltimore*

*Maryland, Question E, Police Department Charter Amendment (November 2024)*, BALLOTPEDIA,

https://perma.cc/EXB8-9GVF.  With this action, the people of Baltimore triggered the legislative

enactments the Mayor and Governor had signed into law, transferring local control of the BPD to

the Mayor and City Council of Baltimore.  The Charter now defines BPD staff as "individual[s]

employed by the Mayor and City Council of Baltimore[.]"  Charter of Baltimore City art. VII §

142(d).  Additionally, the Charter no longer contains the phrase: "[N]o ordinance of the City or act

of any municipal officer, other than an act of the Mayor pursuant to Article IV of this Charter, shall

conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner." *See*

*id.* art. II § 27.

The Baltimore City Code now lists the "Baltimore City Police Department" as an agency

of Baltimore City.  Balt., Md. Code art. 1 § 5-1(b)(2)(iii).  The LGTCA also identifies the BPD as

a local government.  *See* C.J. § 5-301(d)(21).[9]

Before the change in BPD's status, several judges of this Court dismissed state law claims

against the BPD on grounds of sovereign immunity, based on the determination that the BPD is a

State entity.   *See, e.g.*, *Ferguson v. Baltimore Police Dep't*, BPG-21-2502, 2022 WL 3447273, at

*8 (D. Md. Aug. 16, 2022) (concluding that the BPD "is entitled to sovereign immunity from

---

[9] In *Cherkes*, 140 Md. App. 282, 780 A.2d 410, decided in 2001, the Maryland Court of Special Appeals determined that BPD was a State agency, even though it was designated as a local government in the LGTCA. *Id.,* at 325–26, 780 A.2d at 435–36.  The court explained that certain entities, which "plainly are not governments of any sort", are merely treated as local governments, strictly for the purpose of obtaining the benefits of the LGTCA.  *Id.* at 324, 780 A.2d at 434.

plaintiff's MFEPA claim" and dismissing plaintiff's MFEPA claim); *Grim v. Baltimore Police Dep't*, ELH-18-3864, 2019 WL 5865561, at *15 (D. Md. Nov. 8, 2019) (finding that "the BPD is immune as to plaintiff's State law" claims because "State law defines the BPD as a State agency."); *see also Effland v. Balt. Police Dep't*, CCB-20-3503, 2022 WL 3107144, at *6 (D. Md. Aug. 4, 2022); *Grant v. Balt. Police Dep't*, RDB-21-2173, 2022 WL 16746703, at *9 (D. Md. Nov. 7, 2022).

Judge Blake's decision in *Effland*, 2022 WL 3107144, at *6, was issued in August 2022, *i.e.*, prior to the elections of November 2022 and 2024. She concluded that, "[u]nder Maryland law, BPD is not an agency of the municipality of Baltimore", but instead "an agency of the state." In support, she cited section 16-2(a) of the 2021 edition of the PLL. At the time, the provision stated: "The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland." *See Effland*, 2022 WL 3107144, at * 6. However, as Judge Maddox recognized in *Smallwood v. Mayor & City Council of Baltimore: Baltimore Police Dep't,* MJM-23-2891, 2025 WL 487335, at *15 n.12 (D. Md. Feb. 13, 2025), "BPD's status as a state agency immune from MFEPA claims may have changed since the *Effland* decision and other similar decisions of this Court."

More recently, even in cases brought after BPD's change in status, courts have looked to when the underlying conduct occurred to determine whether BPD qualified as a State agency. *See, e.g., Roche v. Mayor & City Council of Baltimore*, No. 1323, Sept. term, 2021, 2024 WL 4210780, at *1, 6 (Md. Ct. Spec. App. Sept. 17, 2024) (concluding that the BPD enjoyed State sovereign immunity because "the Department was an agency of the State" in 2018, when the individual whose death was the basis for the suit perished); *Tillery v. United States Marshals Serv.*, SAG-23-00402, 2024 WL 3598117, at *1–2, 5 (D. Md. July 31, 2024) (dismissing several claims arising

from conduct that occurred before the November 2022 election against the BPD because "BPD is entitled to sovereign immunity from state common law and constitutional claims"); *Jordan v. Mayor & City Council of Baltimore*, SAG-23-03413, 2024 WL 2956094, at *6 n.6 (D. Md. June 12, 2024) (finding that the BPD was entitled to State sovereign immunity, noting that the November 2022 "ballot measure did not occur until after [the] fatal shooting [of the decedent whose death was the basis for the suit]. . . [and] all necessary steps to effectuate the ballot measure are not yet complete, and the BPD remains a state agency as of [June 12, 2024]"); *Gladstone v. Gladstone*, JRR-22-CV-00549, 2023 WL 2571510, at *5 (D. Md. Mar. 18, 2023) (finding that the BPD is a State agency that enjoys common law sovereign immunity in a suit arising from conduct that took place in 2014), *aff'd sub nom. Simon v. Gladstone*, 2025 WL 721317, at *1 n.1 (4th Cir. Mar. 6, 2025) (affirming the district court's judgment without addressing BPD's status as a State agency because the plaintiff did "not challenge the dismissal of those counts on appeal"), *cert. denied,* 2025 WL 2949588 (U.S. Oct. 20, 2025); *Mealey*, 2023 WL 2023262, at *1–2, 18 (dismissing several claims arising from conduct that occurred between 2019 through 2021 because under Maryland law the BPD is a State agency that enjoys common law State sovereign immunity); *Matter of Gaff*, No. 1993, Sept. Term, 2021, 2023 WL 1987853, at *2, *2 n.3 (Md. Ct. Spec. App. Feb. 14, 2023) (finding that a particular statute does not apply to the BPD because, "at the relevant time [2016], BPD was a state agency" although it "operated only in Baltimore City and was funded by Baltimore City", and also noting that "BPD was converted into an agency of Baltimore City on January 1, 2023 pursuant to Chapter 133, Laws of Maryland 2021."), *cert. denied,* 483 Md. 578, 296 A.3d 418 (2023).

Some judges of this  court have declined to address the thorny issue of whether the BPD enjoys State sovereign immunity under Maryland law. *See, e.g., Smallwood v. Mayor & City*

*Council of Baltimore: Baltimore Police Dep't*, MJM-23-2891, 2025 WL 487335, at *15 n.12 (D. Md. Feb. 13, 2025) ("The Court need not reach the question of whether BPD is immune from MFEPA claims in federal court because Plaintiff's claim is subject to dismissal for insufficient pleading, as described above."); *Carter v. Baltimore Police Dep't*, BAH-21-2724, 2025 WL 564381, at *13 n.19 (D. Md. Feb. 20, 2025) ("Because the MFEPA claims fail for the same reasons the federal claims fail, the Court finds it unnecessary to address the sovereign immunity issue raised by Defendant."); *Glanville v. Mayor & City Council of Baltimore, Maryland: Balt. Police Dep't*, EA-23-3395, 2024 WL 5264381, at *13 n.8 (D. Md. Dec. 31, 2024) ("Because there is an alternative basis for dismissal of this [MFEPA] claim, resolution of this question [whether the BPD is immune from suit under the Eleventh Amendment] is unnecessary at this juncture."); *Wiggins v. Baltimore Police Dep't*, MJM-22-1089, 2023 WL 6381515, at *11 n.9 (D. Md. Sept. 29, 2023) ("Because the Court dismisses Plaintiff's [a former BPD detective] MFEPA claim [against the BPD] based on the insufficiency of the pleading, the Court need not address the issues Defendant raises regarding LGTCA notice and sovereign immunity."); *Johnson v. Baltimore Police Dep't*, MJM-22-1356, 2023 WL 6381487, at *12 n.12 (D. Md. Sept. 29, 2023) ("Because the Court dismisses Plaintiff's [former BPD employee] MFEPA claim based on the insufficiency of the pleading, the Court need not address the issues [the BPD] raises regarding LGTCA notice and sovereign immunity."); *Yampierre v. Baltimore Police Dep't*, ELH-21-1209, 2022 WL 3577268, at *47 (D. Md. Aug. 18, 2022) ("Because plaintiff's FEPA claim is subject to dismissal for failure to plead compliance with the LGTCA, it is unnecessary to consider the implications of this complicated question [*i.e.*, whether the BPD has sovereign immunity from MFEPA claims].");  *Gaines v. Baltimore Police Dep't*, ELH-21-1211, 2022 WL 1451629, *32 (D. Md. May 9, 2022) ("Because plaintiff's FEPA claim should plainly be dismissed [for other reasons], it is unnecessary

to reach this complicated question [*i.e.*, whether the BPD has sovereign immunity from MFEPA claims].")

Here, Corrigan alleges that the BPD inflicted discriminatory treatment beginning in September 2023, when he was placed on light duty status because of his perceived disability.  ECF 1, ¶ 26.  Corrigan resigned from the BPD in July 2024.  *Id*. ¶ 37.  Therefore, the conduct that underlies this suit occurred after the November 2022 election, and after the change in the law that went into effect in January 2023, extinguishing BPD's status as a State agency.

In short, the BPD is no longer a State agency.  Therefore, it is not entitled to State sovereign immunity.

Even assuming that the BPD qualifies as a State agency, Corrigan argues that he may litigate his MFEPA claims against the BPD because the State has waived State sovereign immunity.  *See* ECF 16-1 at 6–7.  Plaintiff points to S.G. § 20-903.  It provides: "The State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under this title."

But, a provision in MFEPA may undermine Corrigan's argument.  S.G. § 20-1013(b) provides: "A civil action under this section shall be filed in the circuit court for the county where the alleged unlawful employment practice occurred."  Here, suit was not filed in a State circuit court.

Defendant argues that, under *Pense v. Maryland Dep't of Pub. Safety & Corr. Servs*., 926 F.3d 97 (4th Cir. 2019), the BPD enjoys immunity from MFEPA claims in federal court. ECF 9-1 at 7–8.  In *Pense*, in the context of the Eleventh Amendment, the Fourth Circuit concluded that because S.G. § 20-903 "does not 'specify the State's intention to subject itself to suit in *federal*

*court*,' [this] provision cannot be read to waive the State's Eleventh Amendment immunity." *Id.* at 102 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985)) (emphasis in *Pense*).

The *Pense* Court determined that Maryland had not waived its Eleventh Amendment immunity for MFEPA claims with respect to a State agency that the parties agreed enjoyed Eleventh Amendment immunity. *Pense*, 926 F. 3d at 100–03. The type of immunity on which the BPD relies here is common law State sovereign immunity, not Eleventh Amendment immunity. *See* ECF 9-1 at 7 ("Maryland courts have uniformly and unequivocally held that BPD is entitled to common law state sovereign immunity and thus shielded from liability on state and common law claims.") Therefore, the Court's holding in *Pense* does not appear relevant here.

As noted, BPD is no longer a State agency. Therefore, it is not entitled to State sovereign immunity.

## V.    Conclusion

For the foregoing reasons, I shall deny the Motion. An Order follows.


Date: January 9, 2026                                        _____/s/_____
                                                            Ellen Lipton Hollander
                                                            United States District Judge